UNITED STATES (WILSON, The, v.). See Case No. 17,846.

## Case No. 16,738.

### UNITED STATES v. WILTBERGER.

[3 Wash. C. C. 515.] [1]

Circuit Court, E. D. Pennsylvania. Oct. Term, 1819.

MANSLAUGHTER—SELF-DEFENCE—EVIDENCE—JURISDICTION OF CIRCUIT COURT—OFFENCES COMMITTED ON FOREIGN RIVER.

1. Indictment for manslaughter, committed by the master of an American merchant ship, on a seaman, in the river off Wampoa in China.

2. A man may oppose force to force in defence of himself, his family, or property, against one who manifestly endeavours, by surprise or violence, to commit a felony. The intent of the person resisted, must be to commit a felony, or the killing will not be justified.

[Approved in U. S. v. Outerbridge, Case No. 15,978.]

[Cited in People v. Campbell, 59 Cal. 251; State v. Field, 14 Me. 245. Cited in brief in Perkins v. State, 78 Wis. 551, 47 N. W. 828.]

3. No words or gestures, however irritating, will justify the killing; although they may reduce the offence from murder to manslaughter.

[Approved in U. S. v. Outerbridge, Case No. 15,978.]

[Cited in State v. Wieners, 66 Mo. 25.]

4. The intent to commit the felony must be apparent—the damage must be imminent, and the resistance used necessary to avert the damage.

[Approved in U. S. v. Outerbridge, Case No. 15,978.]

[Cited in People v. Campbell, 59 Cal. 251; State v. Thompson, 9 Iowa, 193; Shorter v. People, 2 N. Y. 200.]

5. The prosecutor must prove, that the blows caused the death; but if he proves that the blows were given by a dangerous weapon—were followed by insensibility or other alarming symptoms, and soon afterwards by death; this is sufficient to impose it on the accused, to show that the death was occasioned by some other cause.

[1] Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

6. Quere, whether this offence. which was committed on a river, was within the jurisdiction of the circuit court of the United States. according to the provisions of the act of congress.

This was an indictment against the defendant [Peter Wiltberger], for the manslaughter of one Peters, a mariner on board the ship Benjamin Rush, committed by the defendant, the master of the said ship. The offence was charged to have been committed on board of this vessel, an American bottom, on the high seas. The evidence was, that at the time the offence is charged to have been committed, the ship lay at anchor in the river Tigris, off. Wampoa, some yards from the shore, in four and a half fathom water, fourteen miles below the city of Canton, and thirty-five miles above the mouth of the river;—that at this place. and higher up the river, the tide ebbs and flows; and in very dry seasons, the water is salt; but at other times it is fresh. and that vessels take in water there, for their return voyages—that there are Chinese forts at the mouth of the river, on each side, which entirely command it; the river not exceeding half a mile in width at the mouth, and retaining the same width at Wampoa;—that a Chinese custom-house officer is taken on board at one of these forts, by foreign vessels. to prevent smuggling.

An objection was made by the defendant's counsel, to the jurisdiction of the court; and this constituted the only point of law which was much controverted. The material parts of the evidence relating to the offence, as charged, are stated in the charge. In support of the objection to the jurisdiction, it was contended, that the question is not as to the extent of the criminal and civil jurisdiction of the admiralty; but whether, under the laws of the United States, manslaughter is cognizable in the courts of the United States, unless it is committed within some place under the exclusive jurisdiction of the United States, or on the high seas; and whether a foreign river or harbour can be considered as the high sea? The 8th section of the first article of the constitution, authorizes congress to define and punish piracies and felonies committed on the high seas; and the 2d section of the third article declares, that the judicial power shall extend to all cases of admiralty and maritime jurisdiction. It is admitted, that under this latter grant, congress might have vested, in any of the courts of the United States, the cognizance of offences committed in any place to which the admiralty and maritime jurisdiction rightfully extends, even although that should be proved to include rivers, ports, and havens. Accordingly, murder and robbery committed in any river, &c., out of the jurisdiction of any particular state of the United States, is made punishable by the 8th section of the act upon which this indictment is founded. [1 Stat. 113.] But the offence of manslaughter is confined, by the 12th section, to the high seas; from which it is plainly to be inferred, that congress

was attentive to the distinction, and intended to make it, between the high or main sea. and waters within the bodies of counties, or within the mouths of rivers.

It was contended, that the term high sea, means the ocean or main sea; and the coast thereof below the low water mark, the space between that and the high water mark, or the sea-coast, being the "divisum imperium" spoken of in the books, and not the same space in arms of the sea, rivers, &c. Cases cited, Co. Litt. 260; 5 Coke, 107; [U. S. v. Hamilton. Case No. 15,290]; De Lovio v. Boit [Id. 3,776]; U. S. v. Ross [Id. 16,196]; 3 Term R. 315; [U. S. v. Bevans] 3 Wheat. [16 U. S.] 371; 2 Browne, Civ. & Adm. Law, 460, 466, 474; 1 Browne, Civ. & Adm. Law, 422; Sir Leon. Jenkins, 76, 77; Heb. De Jure Maris, c. 4; 2 East, P. C. 803, 804; 4 Bl. Comm. 268; Sea Laws, 422.

It was contended, that the grant of jurisdiction to the courts of the United States, to punish offences of this kind, committed in foreign rivers and havens, was unnecessary, as they were clearly cognizable by the tribunals of the country where they were committed, though perpetrated by foreigners, in foreign vessels; those places being parts of the public domain of that nation. Vatt. Law Nat. bk. 1, c. 20, § 245; Id. c. 22, § 278; Id. c. 23, § 295; Id. bk. 2, c. 7, § 84.

It was contended, by the district attorney, that the place where this offence was committed, is within the admiralty and maritime jurisdiction, as asserted and exercised, invariably, on the continent of Europe, and always in England, until after the statutes of Richard II.; seconded by the prohibitions and usurpations of the common law courts. The constitution vests in the judicial department of the government, cognizance of all cases of admiralty and maritime jurisdiction; and thereby clearly refers to that jurisdiction, as generally understood and exercised amongst the nations of Europe; and not to the exercise of it at the period when the constitution was framed. Of this general nature was the jurisdiction of the colonial courts of admiralty, at the period of the Revolution. This power, then, having been conferred on the legislature, it is not to be believed, that congress could have intended, by the expression of high seas. to have this, and many other offences enumerated in this act, committed on runs and arms of the sea, either dispunishable altogether, or subject to the will or caprice of a foreign government, to punish them or not, as such government might think proper. There is no civilized nation, with which we are acquainted, where jurisdiction over offences committed on board of its own vessels, in foreign ports, would not be exercised; and it is incredible, that congress intended to place the tribunals of the United States, in this respect, in a different predicament. That congress did not so intend, is obvious from the whole tenor of this law; where we find the "high seas," the "high sea," and "sea,"

used promiscuously, and as synonymous throughout the different sections. This is remarkable in the 12th section, in reference to offences, between which scarcely a shade of difference can be discovered. He contended, that the high seas include not only the coasts of the sea, but the arms of the sea, runs, creeks, and harbours below the low water mark. Cases cited. U. S. v. Ross [supra]; U. S. v. M'Gill [Case No. 15,676]; 1 Burrows, 266; 2 Browne, Civ. & Adm. Law, 403, 404, 457, 464, 468, 484, 486, 487; 2 Sir Leon. Jenkins, 708, 745; 1 Hale, P. C. 424; Com. Dig. tit. "Admiralty," 9; 4 Inst. 136, 137; Constable's Case, 5 Coke, 105b; De Lovio v. Boit [supra].

Upon the merits, it was insisted, by the counsel for the defendant, 1st, that the blows, inflicted upon the deceased by the defendant, were not the cause of his death; and that the evidence clearly established, that it was produced by a mortification of the stomach, caused by the improper use of an ardent spirit, distilled in China, and known by the name of samchoo. 2d. That, if the death was caused by the blows, still the homicide was justifiable, on account of the menacing attitude of the deceased, and the combination which had been formed amongst the crew, to resist the master, in case he should strike any one of them.

Charles J. Ingersoll, U. S. Dist. Atty.

J. Sergeant and Joseph R. Ingersoll, for defendant.

WASHINGTON, Circuit Justice (charging jury). The evidence may be arranged under two heads,—1st, that which relates to the death of Peters; and 2d, to the cause of it.

1. Coles, the witness most relied upon by the defendant's counsel, to justify his conduct upon this unfortunate occasion, has testified, that the deceased, being aloft, was called down by the defendant, in consequence of some expressions of discontent at being sent up, which were not distinctly heard by the defendant. As he went aft to the quarter deck, where the defendant was standing, he pulled off his jacket, rolled up the sleeves of his shirt, and approached the defendant with folded arms. Being asked by the defendant what he was grumbling at, he complained of being unwell, and was ordered by the defendant to go below, accompanied with an observation, that he knew that no person on board, in that situation, was required to do duty. The defendant then turned his back upon Peters, and walked to and fro on the quarter deck. Peters still continued on the deck; altered the position of his arms; and, with his fists clenched, and in a menacing attitude, impertinently addressed the defendant, observing, "You called me down, with intention, I suppose, to flog me; —I wish to know if you mean to do it or not?"—To which the defendant answered, "If you want flogging, I will flog you;" and immediately struck the deceased with his fist. About this time, Clark, another seaman, came abaft the windlass, and then Peters sprang toward the defendant; but whether he struck the defendant or not, the witness could not testify. The defendant then picked up a stave, (which all the witnesses say was of white oak and large,) and struck Peters with it on the head. Immediately after this, a conflict took place between the defendant and Clark, the latter having grasped the right arm of the defendant with one of his hands, and his collar with the other. Clark was ordered to go forward, which he did; but immediately afterwards returned; and the order being repeated, he refused, with insolent language, to do so, which was followed by a blow, inflicted on him by the defendant, with the stave, which Clark returned with another stave, and prostrated the defendant; Clark then went forward, and here the affray ended. As to the throwing off his jacket, and rolling up his sleeves, by Peters, Coles is supported by two other witnesses. Some evidence was given by another witness, as to the menacing attitude of Peters, after the defendant told him to go below; and two other witnesses have testified, that the defendant struck Peters with his fist, not in the first instance, but after he had been stricken with the stave, and as he fell. The advance of Clark at the time mentioned by Coles;—the springing of Peters towards the defendant, and the seizing of the defendant by Clark, are facts unsupported by any other witness, and are in effect contradicted by them. Coles saw but one blow with the stave. The other witnesses speak of two, and three; and all agree, that, from the time that Peters was knocked down, he continued speechless, and senseless, till his death; which happened about eighteen hours afterwards.

Upon this evidence, the first question is, whether this homicide, (if attributable to the defendant,) amounted to the crime of manslaughter? Manslaughter is the unlawful killing of another, without malice, either express or implied. It differs from murder in the important particular of the absence of malice; as where it happens in a sudden heat, when passion has obtained the dominion over reason and the gentler feelings of the heart. From a respect to human infirmities, our law, in such a case, mitigates the offence of murder into manslaughter, as well as the punishment. Still, however, this offence is unlawful; the law not permitting any man to avenge his own wrongs, unless in a case of great emergency, by the death of the supposed offender. The present case is one which the defendant's counsel have contended is justified by law;—justified, they say, upon the ground of self-defence. As to this, the law is, that a man may oppose force to force, in defence of his person, his family, or property, against one who manifestly endeavours, by surprise, or violence, to commit a felony, as murder, robbery, or the like. In

this definition of justifiable homicide. the following particulars are to be attended to. The intent must be to commit a felony. If it be only to commit a trespass, as to beat the party, it will not justify the killing of the aggressor. No words—no gestures, however insulting and irritating—not even an assault, will afford such justification; although it may be sufficient to reduce the offence from murder to manslaughter. In the next place, the intent to commit a felony must be apparent, which will be sufficient; although it should afterwards turn out that the real intention was less criminal, or was even innocent. This apparent intent is to be collected from the attending circumstances. such as the manner of the assault. the nature of the weapons used, and the like; and, lastly, to produce this justification. it must appear that the danger was imminent, and the species of resistance used, necessary to avert it.

Nailor's Case is a strong exemplification of the law, as here stated. The homicide was decided to be manslaughter, and not murder; because it took place in a sudden affray, and in the heat of passion. But it was not considered to be justifiable; because the apparent intent of the deed, was merely to rescue the father, and by no means to affect the life of the deceased; and there was no such danger as could render the use of the weapon, which caused the death, necessary. The case of the adulterer, killed by the offended husband, at the moment when he discovers his dishonour, is another. and a very strong example of the rule; although no provocation can be more difficult to bear with, yet the law does not reduce the offence below that of manslaughter.

It is for you, gentlemen of the jury, to say, upon the whole of the evidence given in this case, whether there was any intention in the deed, apparent, or otherwise, to take the life of the defendant, or to commit any known felony; and whether there existed any danger which rendered it necessary for the defendant to use the weapon which he did?.

It is contended by the defendant's counsel, that the combination amongst the seamen to resist any attempt of the defendant to strike, or to correct them, affords a ground of justification, which distinguishes this from ordinary cases of a simple assault, happening on land.

This distinction is inadmissible, in the present case, for the following reasons: (1) There is no evidence that this combination, if it was ever formed, was at any time communicated to the defendant. (2) The circumstances of the moment, afforded no indication that mutiny or resistance of any kind was intended, much less "that it was imminent;" as there was but one seaman on the deck, besides Peters, who appeared to take any part or interest in the affray; and the appearance of that seaman, was subsequent to the termination of the conflict between the defendant and Peters. Some indulgence,

we admit, may be claimed by the master of a vessel, beyond what the· law extends to a person on shore. He may not be required to retreat, when assaulted by a seaman; so as thereby to indicate fear, and to diminish his authority, so essential to the due subordination of his crew. In like manner, slighter evidence of danger may be admitted in his justification, than in that of a person on land. Still, it must be shown. that there was a necessity for what he did, to prevent an apparent intention to commit a felony. Even an officer of justice, who has a warrant commanding him to arrest a person, must prove resistance; and that the act which occasioned the death of the party to be arrested, was necessary.

2. The next, and by far the most important question in this case, is, whether the blows inflicted on the deceased by the defendant, were the cause of his death? It has been truly stated by the defendant's counsel, that the proof of this fact lies upon the prosecutor. He has accordingly laid before you evidence. that Peters was. by repeated blows, inflicted by a dangerous weapon on the head, knocked down; and that from that time, until his death, which took place in about eighteen hours afterwards, he continued speechless, insensible, and motionless, with no other sign of life than a difficult respiration.

It is unnecessary for the prosecutor to prove more, to establish the fact in controversy. The law presumes, that the death was occasioned by the alleged cause; unless the contrary can be clearly established to your satisfaction, by proving, either that this was not the cause of the death, or by showing some other cause which was sufficient to produce that effect. It will not do to assign some other possible or probable cause, unsupported by evidence of at least equal weight with that assigned in support of the prosecution. To prove that the blows inflicted on the deceased, by the defendant, did not occasion his death, the defendant relies upon the testimony of many respectable witnesses, who examined the body soon after the death took place; who have declared, that there were no appearances of violence having been committed on any part of it except the head, and that the skull was free from any appearance of fracture. To prove that the death is to be attributed to another cause, evidence is given you by the same witnesses, that the body was opened by a surgeon, and that the stomach evinced a high state of inflammation, if not of gangrene. It has also been proved, that Peters had, on different occasions, and even recently before the wounds inflicted by the defendant. drank of a species of ardent spirits, distilled in China, called by the natives "samchoo"; and that a liquid which resembled samchoo in smell, was discharged from the mouth and nostrils of the body when it was examined, which became more copious by pressure on the stomach. Many instances of the deleterious effects of this.

liquor, have been stated by the witnesses; and the physicians who have been examined, have given it as their opinion, that this liquor, taken into a stomach diseased, or predisposed to inflammation, might in a short time so increase the state of inflammation, as to produce mortification and sudden death.

Upon this evidence, you must decide to which of these causes the death of Peters is to be attributed; and if you should doubt, let that doubt be cast into the scale of innocence.

As to the question of jurisdiction, there will be no necessity for the court to give an opinion upon it, if you should think that the defendant is not guilty of the offence of manslaughter. Should your opinion be unfavourable to the defendant, you will find him guilty, subject to the opinion of the court upon the facts of the case.

The jury found the defendant guilty, subject to the opinion of the court upon a case stated, upon which the question of jurisdiction was carried to the supreme court. See 5 Wheat. [18 U. S.] 76.