REVISED

# UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

Nos. 95-30219 & 95-30697

BRAM C. COUMOU,

Plaintiff-Appellee,

versus

UNITED STATES OF AMERICA,

Defendant-Appellant,

and

LIEUTENANT JACOBLOWSKI; COMMANDER
MIZELL; LIEUTENANT KONTRATOWICZ,

Defendants.

Appeals from the United States District Court
for the Eastern District of Louisiana

February 26, 1997

Before POLITZ, Chief Judge, HIGGINBOTHAM and SMITH, Circuit Judges.

POLITZ, Chief Judge:

The United States appeals the bench trial judgment finding it liable for personal injury and property damages incurred by Bram C. Coumou. We conclude that the district court improperly predicated liability on the federal extradition statutes, 18 U.S.C. § 3181 *et seq.*, and the Maritime Drug Law Enforcement Act,

46 U.S.C. app. § 1903.  It remains for resolution, however, whether the government engaged in negligent conduct that is subject to the waiver of sovereign immunity contained in the Public Vessels Act, 46 U.S.C. § 781 *et seq*.  We remand for the district court to determine whether federal agents were negligent in failing to notify Haitian officials that Coumou was a government informant who cooperated with drug enforcement officers in their search of his vessel.

Background

Coumou was the owner and master of the M/V NORDIC, a coastal freighter of Honduran registry.  On June 2, 1991 the NORDIC departed port in Colombia with a load of cement bound for St. Marc, Haiti.  Shortly after leaving port Coumou, suspecting that member(s) of his crew might have concealed narcotics in the containers of cement he was carrying, made radio contact with the United States Coast Guard station in Miami.  Coumou advised of his suspicions and asked the Coast Guard to board his vessel to determine whether any contraband was aboard.  The Coast Guard acknowledged the transmission but made no definitive response to Coumou's request.

On June 6 the NORDIC was sighted by a patrol aircraft that reported its position and course to a Coast Guard Law Enforcement Detachment (LEDET) operating off a naval warship, the frigate U.S.S. ELROD.[1]  Soon thereafter the ELROD intercepted the NORDIC on the high seas and Lieutenant Kondratowicz,

---

[1]It is unclear from the record whether this patrol plane had been dispatched in response to Coumou's June 2 radio transmission or was simply monitoring maritime traffic.

commander of the LEDET, had radio discussions with Coumou about boarding.[2] Because of a mechanical problem with the outboard motor on the ELROD's launch, the boarding was delayed until the next day.

As the ELROD tracked the NORDIC in anticipation of the LEDET boarding, Kondratowicz communicated the situation to COMCARIBRON, his operational command in the Seventh Coast Guard District. Because the circumstances of the prospective boarding involved a Honduran ship destined for and fast approaching Haitian territorial waters, the office of the Commandant of the Coast Guard coordinated with the Departments of State and Justice, pursuant to Presidential Directive 27, in order to obtain permission of the flag state, Honduras, to board the vessel.[3] By the morning of June 7 the State Department had received permission from both Honduras and Haiti to board the NORDIC. This information was relayed to the Coast Guard, which notified the ELROD.

The NORDIC, which overnight had sailed temporarily into Haitian territorial waters, was boarded on the morning of June 7. At this time Coumou repeated his suspicions to Lieutenant Kondratowicz. The armed LEDET boarding party searched the vessel but found no contraband. During the boarding the NORDIC

---

[2]At the time the ELROD made its initial contact with the NORDIC, Coumou informed Lieutenant Kondratowicz about his previous radio transmission to the Coast Guard and repeated his suspicions directly to the LEDET commander. Kondratowicz received confirmation that Coumou previously had contacted the Coast Guard on June 2, but was not told the content of the prior communications.

[3]This directive mandates interdepartmental coordination and consultation when non-military situations arise which could affect adversely the United States' foreign policy.

exited Haitian territorial waters and returned to international waters, following its planned track line into St. Marc. By this time, the United States government was aware that Coumou was an American citizen.

Later that day, as the NORDIC was preparing to re-enter Haitian waters on its final approach to St. Marc, it became apparent to the LEDET that an exhaustive search of the NORDIC's cargo of bags and pallets of cement would not be possible at sea. Lieutenant Kondratowicz radioed a report to his superiors and requested instructions. While a decision was pending, Lieutenant Kondratowicz, acting upon interim orders from COMCARIBRON, ordered Coumou to steer a northerly course to keep the vessel in international waters. Coumou initially refused, acquiescing only after Lieutenant Kondratowicz told him that if he did not comply the LEDET would take command of the helm.

After a wait of several hours, which the NORDIC spent adrift in international waters, COMCARIBRON issued instructions for the NORDIC to proceed to St. Marc, where its cargo would be searched more thoroughly as it was off-loaded. This directive was given because the Coast Guard, through the PD-27 process, had secured the Haitian government's permission to undertake an American law enforcement operation within its sovereign territory. The LEDET was ordered to remain on board the NORDIC during the remainder of the voyage, and the ELROD was instructed to escort the vessel into St. Marc.

When the NORDIC arrived at St. Marc, several Haitian officials boarded to meet with Coumou; after this initial encounter the Haitian presence at the dock was

4

token, consisting of a handful of policemen who merely observed the transfer of cargo. Soon after arrival, the NORDIC began off-loading its cargo under the watchful eyes of the LEDET. This off-loading was done by Coumou, the only available crane operator, with the assistance of Haitian stevedores.

On June 8 the ELROD departed Haiti under orders, leaving its LEDET to oversee the situation. Within a day the Coast Guard cutter TAMPA, with its own LEDET led by Lieutenant Craig Henzel, arrived to take charge of the operation. Lieutenant Henzel was not briefed on the extent of Coumou's antecedent efforts to secure Coast Guard assistance in searching his vessel for contraband.

For the duration of the off-loading the TAMPA's LEDET maintained a secure perimeter around the NORDIC and visually inspected each item of cargo before it was removed from the loading dock. On the third day of the off-loading Lieutenant Henzel's crew discovered cocaine hidden in the cement. Haitian police officials watched Lieutenant Henzel field-test the cocaine but made no move to interfere or take charge of the situation.[4] Coumou and his crew were held in the captain's cabin under armed guard pending their disposition.

Once the cocaine was discovered, the Haitian government decided to assert its jurisdiction and requested custody of Coumou, his crew, and his vessel. The Coast Guard again turned to the PD-27 process to determine how to proceed. The situation reports and related memoranda before the decision-makers at this level

---

[4]The cocaine was ultimately delivered into the custody and control of Commander Mizell, the Coast Guard attache at the United States embassy in Port-au-Prince.

were grossly deficient and inaccurate; in particular, there was no indication that Coumou had ever asked for a boarding, no information that the NORDIC was in international waters during the boarding, false reports that the NORDIC was a "mother ship," false reports concerning Coumou's demeanor and conduct during the boarding,[5] and a significant overestimation of the Haitian government's negligible role in the seizure of the cocaine. After considering this misinformation, the PD-27 decision-makers decided to defer to Haiti's request for jurisdiction. Accordingly, the order was issued to turn the NORDIC and her crew over to Haitian authorities.

Coumou was incarcerated in Haiti for six months. The experience was a nightmare. During this time he suffered from malnutrition, infections, and diseases, including bronchitis, pneumonia, kidney infection, chronic back pain, nerve disorder, fungal and eye infection, chronic diarrhea, dehydration, and marasmus, and he witnessed numerous atrocities, perpetrated both by Haitian officials and other prisoners, including beatings and torture, some of which ended in the death of the victim.

Coumou was finally tried and acquitted on November 22, 1991. Despite his

---

[5]The situation reports ultimately reaching the higher echelons of Coast Guard command regarding the initial contact between the LEDET and the NORDIC indicated that Coumou was "belligerent" and "uncooperative" and that his prior radio transmission appeared to be a "ploy" to draw suspicion from his vessel. At trial, however, Lieutenant
Kondratowicz contradicted these reports, testifying that Coumou was cooperative and that he never considered his prior transmission to be a "ploy." The United States did not account for the discrepancy between these reports and Kondratowicz's trial testimony.

acquittal, the Haitian government refused to return his ship, money, or passport. Coumou left the country the day after his acquittal, having been informed by his attorney that the Haitian government was appealing the acquittal and that he might be thrown back into prison.[6]  After Coumou returned to New Orleans, he continued to suffer from physical ailments caused by his incarceration in Haiti as well as anxiety and alcoholism, and was diagnosed with post-traumatic stress disorder.

Coumou filed this action naming the United States as defendant and alleging that his injuries had been caused by the government's tortious conduct.[7]  After a trial limited to the issue of liability, the district court entered a memorandum opinion finding the United States liable for Coumou's injuries.  The United States timely appealed.

Analysis

The government's liability is governed by the waiver of sovereign immunity set forth in the Public Vessels Act, 46 U.S.C. § 781 *et seq.*[8]  The PVA allows

---

[6]Coumou was also forced to sign over to his attorney a power-of-attorney giving her control of the NORDIC and pay her fee of $45,000 or face the same risk of returning to prison in Haiti.

[7]Claims against Lieutenant Kondratowicz and Commander Mizell, also named as defendants, were voluntarily dismissed with prejudice during trial.

[8]See **United States v. United Continental Tuna Corp.**, 425 U.S. 164 (1976) (demarcating boundary between the PVA and the Suits in Admiralty Act, 446 U.S.C. § 741 *et seq.*).  All parties concede that this case, arising as it does out of a Coast Guard police action on the high seas involving the master of a vessel engaged in maritime commerce, falls within the district court's admiralty and maritime jurisdiction.  **Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.**, 513 U.S. 527 (1995).  The availability of a maritime remedy under the PVA excepts Coumou's claim from the Federal Tort Claims Act.  28 U.S.C. § 2680(d); **American Stevedores, Inc. v. Porello**, 330 U.S. 446 (1947).

recovery of personal and property damages "caused by a public vessel of the United States"[9] and subjects the United States to the same liability imposed under admiralty law upon private parties in the same or similar circumstances.[10] In admiralty cases such as this we review the district court's findings of fact for clear error and consider all questions of law *de novo*.[11] "The district court's rulings on negligence, cause, and proximate cause are findings of fact,"[12] while its determination of the existence of a legal duty is a question of law.[13]

The district court found that the search of the NORDIC "was impeded by considerable confusion, miscommunication and misinformation, some of which appears to be deliberate, or at least, perverse after the fact attempts at cosmetic restoration." It did not, however, ground liability on general maritime tort law. Rather, it found the United States liable for negligence *per se* premised upon the United States' failure to comply with two distinct statutory provisions. We agree with the government that these two statutes do not generate liability in this case.

---

[9] 46 U.S.C.§ 781; **Porello**, at 450. In accordance with traditional principles of maritime law, the consent to suit embodied in PVA includes cases where actionable injury is caused by the conduct of the personnel or crew of a public vessel and not by the vessel itself. **Canadian Aviator, Ltd. v. United States**, 324 U.S. 215 (1945).

[10]**Canadian Aviator**; **Walls Industries, Inc. v. United States**, 958 F.2d 69 (5th Cir. 1992). The fact that the government's conduct involved a uniquely sovereign function, maritime law enforcement, does not change our inquiry. **Indian Towing Co. v. United States**, 350 U.S. 61 (1955).

[11]**Mendes Junior Int'l Co. v. M/V Sokai Maru**, 43 F.3d 153 (5th Cir. 1995).

[12]**Bertram v. Freeport McMoran, Inc.**, 35 F.3d 1008, 1019 (5th Cir. 1994) (internal quotation marks omitted) (citations omitted).

[13]**Forrester v. Ocean Marine Indem. Co.**, 11 F.3d 1213 (5th Cir. 1993).

The first duty addressed by the trial judge is based on federal extradition laws, 18 U.S.C. § 3181 *et seq.*, which implement the process for domestic enforcement of extradition treaties. In this case, however, the extradition process was never invoked by the executive branch; therefore, any protections these statutes might have offered to Coumou are inapposite.[14] Because Coumou does not fall into the class of persons the extradition statutes are intended to protect, i.e. prospective extraditees, their alleged violation cannot form the basis of a claim of negligence *per se*.[15]

The district court also relied upon 46 U.S.C. app. § 1903, the criminal statute the Navy and Coast Guard were enforcing when the NORDIC was intercepted. Particular reference was to subsection (f), which provides that "[a]ny person who violates this section shall be tried in the United States district court . . . ." Construing this provision *in pari materia* with other applicable federal rules and regulations, the trial court discerned a congressional mandate that any person arrested for a violation of section 1903 should be transported immediately to the nearest federal magistrate. In this the district court erred. Section 1903(f), and the other statutes relied upon by the district court, do no more than regulate the prosecution of a criminal defendant in federal court; they do not prescribe a general code of conduct applicable in instances such as this where the government has

---

[14]See **United States v. Alvarez-Machain**, 504 U.S. 655 (1992) (remarking that there is no "right under the extradition treaty to be returned to this country only in accordance with its terms"); **Ker v. Illinois**, 119 U.S. 436 (1886).

[15]**Melerine v. Avondale Shipyards, Inc.**, 659 F.2d 706 (5th Cir. Unit A 1981).

9

exercised its discretion and decided not to indict or prosecute an arrestee.[16] Such an incidental violation of a federal statute alone, absent some breach of a correlative duty of care, cannot form the basis of a finding of liability under the PVA.[17]

The fact that the government did not violate a statute, however, does not end our inquiry. The general maritime law of negligence recognizes a duty of reasonable care under existing circumstances[18] when warranted by general tort law principles.[19] As we read the district court's opinion, it did not reach the question of common-law negligence. We will remand the case so that the district court can explore whether the government breached its duty of reasonable care.

The government contends that its conduct falls within the discretionary function exception to its waiver of sovereign immunity.[20] This exception prevents private suits against the federal government based on decisions that implicate public policy choices. We have held that "the discretionary function exception in

---

[16]See **Wayte v. United States**, 470 U.S. 598 (1985).

[17]See **Johnson v. Sawyer**, 47 F.3d 716 (5th Cir. 1995) (en banc).

[18]**Kermarec v. Compagnie Generale Transatlantique**, 358 U.S. 625 (1959); **Melerine**.

[19]**Gavagan v. United States**, 955 F.2d 1016 (5th Cir. 1992); **Consolidated Aluminum Corp. v. C.F. Bean Corp.**, 833 F.2d 65 (5th Cir. 1987), cert. denied, 486 U.S. 1055 (1988).

[20]See **Dalehite v. United States**, 346 U.S. 15, 34 (1953) (characterizing the exception as circumscribing "the discretion of the executive or the administrator to act according to one's judgment of the best course); **Wysinger v. United States**, 784 F.2d 1252 (5th Cir. 1986).

principle shields from tort liability the Coast Guard's apprehension . . . of drug-running vessels."[21]  According to the government, its decision to release Coumou to Haitian jurisdiction—and indeed its entire method of investigating drug trafficking—is a matter of policy that continues to enjoy sovereign immunity even after passage of the Public Vessels Act.

We are not persuaded that the discretionary-function exception necessarily defeats Coumou's suit.  Even if the government is immune from tort suits with respect to its policy decision to search the NORDIC in Haiti and then accede to the Haitian request to exercise Haitian jurisdiction, it still had a duty to exercise reasonable care in carrying out that policy.[22]  "Courts have generally drawn a line between decisions at a planning level, or decisions that exercise policy judgment, and decisions at a[n] operational level, or decisions that are merely incident to

---

[21]**B&F Trawlers, Inc. v. United States**, 841 F.2d 626, 631 (5th Cir. 1988).

[22]See **Johnson v. Sawyer**, 4 F.3d 369 (5th Cir. 1993) (holding that the IRS's policy decision to publish the names of taxpayers who violate criminal tax laws does not shield it from liability for negligently releasing embarrassing information), *vacated*, 47 F.3d 716 (5th Cir. 1995) (en banc) (dismissing the FTCA claim because local Texas law would
not have provided a cause of action for the disclosure of the embarrassing information); **Wysinger** at 1253 ("[O]nce the government has made a decision to act the government is responsible for acts negligently carried out even though discretionary decisions are constantly made as to how those acts are carried out."); **United States v. Gavagan**, 280 F.2d 319, 325 (5th Cir. 1960) (finding liability for "failure to pass on and evaluate vital information" during an attempt to rescue a sinking shrimper boat), cert. denied, 364 U.S. 933 (1961).  See also **Lettsome v. United States**, 411 F.2d 917 (5th Cir. 1969) (finding that the failure of a naval employee to warn of a particular defect was negligence for which the United States was liable); **United States v. Lawter**, 219 F.2d 559 (5th Cir. 1955) (finding the government negligent for allowing an untrained man to operate helicopter rescue equipment).

carrying out a government policy."[23] The government failed to communicate potentially exculpatory information from one LEDET to another and then failed to communicate that information to Haitian police and prosecutors. The United States has no policy interest in treating informants the same way it treats other suspected criminals. Its need for discretion in conducting foreign relations does not include a need to decide whether to inform foreign governments that there may be no basis for prosecuting a United States citizen because he provided the tip that led to the arrest. The government was required to take reasonable care to see that Haitian officials learned of Coumou's cooperation. Its failure to transmit the information may have been the result of a breach of that duty.

We remand Coumou's suit for the district court to determine whether the government's failure to convey information to Haitian authorities constituted a breach of its duty of reasonable care. Although we have outlined above some of the facts the district court may consider, we express no view as to what findings and conclusion that court should reach on the ultimate question of negligence.

REVERSED AND REMANDED.

---

[23]**Trevino v. General Dynamics Corp.**, 865 F.2d 1474, 1484 (5th Cir.), cert. denied, 493 U.S. 935 (1989).