**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 01-20626**
_____

**UNITED STATES OF AMERICA,**

**Plaintiff—Appellant,**

**versus**

**NESTOR SUERTE,**

**Defendant—Appellee.**

**Appeal from the United States District Court**
**for the Southern District of Texas**

May 14, 2002

Before DUHÉ, BARKSDALE, and DENNIS, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

At issue is whether, for extraterritorial application of the Maritime Drug Law Enforcement Act, 46 U.S.C. App. § 1901 _et seq._, the Fifth Amendment's Due Process Clause requires a nexus between a foreign citizen and the United States, where the flag nation for his vessel "has consented or waived objection to the enforcement of United States law by the United States". **_Id._** § 1903(c)(1)(C). Requiring such a nexus, the district court dismissed the indictment for lack of jurisdiction. **VACATED and REMANDED.**

Defendant Nestor Suerte, a Philippine national and resident of Colombia, has apparently never entered the United States. The Government alleges the following.

Suerte was captain of a freighter registered in Malta and owned by a member of a Colombian/Venezuelan drug trafficking organization (DTO); he met in Venezuela with DTO members in July and August 2000 to coordinate loading the freighter, off the northern coast of Venezuela, with 4900 kilograms of cocaine for transport to, and distribution in, Europe; the freighter apparently departed Venezuela on 11 August; the next day, an attempt was made, using speed boats, to transport the cocaine to it; after Venezuelan law enforcement detected the boats, they took evasive action; as a result, approximately 2700 kilograms of the cocaine was lost; and the remainder was stored for another attempt.

The DTO telexed Suerte plans for the second attempt, to occur at designated coordinates on 18 August; on 16 and 17 August, however, Venezuelan authorities arrested some of the DTO members, thwarting the second attempt; but, nevertheless, on 17 August, the freighter was at the vicinity of the designated rendezvous point, in international waters.

The United States requested, and received, permission from Malta (the flag nation) to board and search the freighter. (More specifically, Malta waived objection to the search, and the Coast

Guard issued a Statement of No Objection to the boarding team.)  A search by the Coast Guard did not find cocaine.

Approximately a week later, Malta waived objection to the enforcement of United States laws over the freighter and its crew. The Government towed the vessel to the Port of Houston, Texas; on 2 September, it was searched by United States Customs Special Agents; found in Suerte's cabin was a torn copy of the above-referenced telex giving the date, time, and coordinates for the second attempt to load cocaine; and also found was an attache case containing $3500 in $100 bills.

Suerte was arrested and indicted for *conspiracy* (as discussed *infra*) to possess, with intent to distribute, more than five kilograms of cocaine on board a vessel subject to United States jurisdiction, in violation of the Maritime Drug Law Enforcement Act (MDLEA), 46 U.S.C. App. § 1903.  The Act provides, in pertinent part:

> (a)  It is unlawful for any person ... *on board a vessel subject to the jurisdiction of the United States* ... to knowingly or intentionally ... possess with intent to ... distribute[] a controlled substance.
>
> ....
>
> (c)(1)  For purposes of this section, a "vessel subject to the jurisdiction of the United States" includes—
>
> ....
>
> (C)  a vessel registered in a foreign nation where the *flag nation has*

3

> *consented or waived objection* to the enforcement of United States law by the United States;
>
> ....
>
> (j) Any person who attempts or *conspires* to commit any offense defined in this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

*Id.* (emphasis added).

Suerte moved to dismiss the indictment for lack of jurisdiction, claiming that, because he did not have a nexus to the United States, the Constitution does not permit the MDLEA to have extraterritorial effect over him. *See **United States v. Suerte***, No. H-00-CR-659-1, slip op. at 3 (S.D. Tex. 7 June 2001). Agreeing with Suerte's position, the district court reviewed international law principles of extraterritorial jurisdiction, which "represent[ed] the different types of nexuses recognized under international law, and thus, inform[ed its] analysis", *id.* at 5; held no nexus existed between Suerte and the United States; and, accordingly, dismissed the indictment.

## II.

The Government contends: the Due Process Clause does not require an individualized nexus for extraterritorial application of the MDLEA; alternatively, one exists. Normally, we would first address the Government's alternative position. This is because, as a general, prudential rule, we have a "strong duty to avoid

4

constitutional issues that need not be resolved in order to determine the rights of the parties to the case under consideration". *County Court of Ulster County, N.Y. v. Allen*, 442 U.S. 140, 154 (1979).

Whether the Due Process Clause requires such a nexus, however, is a much more straightforward question than whether a Philippine national and resident of Colombia, engaged in a large-scale conspiracy to traffic drugs internationally, but whose voyage is not proceeding to the United States, has a nexus with this Country. Therefore, it is appropriate to first consider the constitutional question. We review *de novo* the district court's holding. *See, e.g.*, *United States v. Brown*, 250 F.3d 907, 913 (5th Cir. 2001).

## A.

In addition to the Supreme Court's not having addressed whether there is such a nexus requirement for the extraterritorial reach of the MDLEA, this issue is one of first impression for our court.

## 1.

To date we have published only two opinions regarding the MDLEA. *See* *United States v. Bustos-Useche*, 273 F.3d 622 (5th Cir. 2001); *Coumou v. United States*, 107 F.3d 290 (5th Cir.), *withdrawn in part and superseded in part*, 114 F.3d 64 (5th Cir. 1997). Neither case concerns the *due process* constraints *vel non* governing the MDLEA's extraterritorial reach.

*Bustos-Useche*, however, approaches resolving the issue at hand. That case involved a (presumably) Colombian defendant, aboard a Panamanian vessel bound for Portugal through international waters between Hispaniola and Puerto Rico. Based on information provided by the Greek government, the United States suspected the vessel of drug trafficking. Panama waived objection to the United States' boarding and searching the vessel. The flag-nation's consent to enforcement of United States law was given *before* trial but *after* the Government's search for, and seizure of, drugs aboard the vessel in international waters. *Bustos-Useche*, 273 F.3d at 624.

In addressing whether this belated consent satisfied § 1903's *statutory* jurisdictional requirements, we noted:

> Because Panama consented to the enforcement of United States law over the [vessel] prior to ... trial, the district court had jurisdiction ... *so long as* the criminal statute under which [the defendant] was prosecuted meets *the subject matter jurisdiction requirements of Article III of the United States Constitution* and 18 U.S.C. § 3231 [(conferring original jurisdiction on district courts for "offenses against the laws of the United States")]. Section 1903(a) defines a "law of the United States" sufficiently enough to satisfy Article III and defines an "offense against the law of the United States" sufficiently enough to satisfy ... § 3231. Therefore, the district court had the authority to act on this case.

6

*Id.* at 628 n.6. This implies that the only *constitutional* constraint on jurisdiction under the MDLEA is to be found in Article III, not the Due Process Clause.

2.

Of the three circuits that have addressed the issue at hand, only the Ninth Circuit has held the Due Process Clause requires a nexus.

a.

*United States v. Davis*, 905 F.2d 245 (9th Cir. 1990), *cert. denied*, 498 U.S. 1047 (1991), involved a British vessel seized in international waters off California. A search of the vessel, pursuant to Great Britain's consent, discovered over 7000 pounds of marijuana. *Id.* at 247.

The vessel's captain, Davis, who was not a United States citizen, was prosecuted under the MDLEA and contested its extraterritorial application. Because "[t]he Congress shall have power ... [t]o define and punish Piracies and Felonies committed on the high Seas, and Offenses against the Law of Nations" (Piracies and Felonies Clause), U.S. CONST. art. I, sec. 8, cl. 10, the Ninth Circuit first decided that the clause "authorize[s] Congress to give extraterritorial effect to the [MDLEA]". *Davis*, 905 F.2d at 248. The Ninth Circuit qualified this holding: "In order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus

7

between the defendant and the United States *so that such application would not be arbitrary or fundamentally unfair*". ***Id.*** at 248-49 (emphasis added; internal citation omitted).

Further rationale for the Ninth Circuit's nexus requirement was provided by ***United States v. Klimavicius-Viloria***, 144 F.3d 1249 (9th Cir. 1998), *cert. denied*, 528 U.S. 842 (1999).

> The nexus requirement serves the same purpose as the "minimum contacts" test in personal jurisdiction. It ensures that a United States court will assert jurisdiction only over a defendant who "should reasonably anticipate being haled into court" in this country.

***Id.*** at 1257 (quoting ***World-Wide Volkswagen Corp. v. Woodson***, 444 U.S. 286, 297 (1980)). (On the other hand, the Ninth Circuit does not require a nexus for stateless vessels, also covered by the MDLEA, § 1903(c)(1)(A). *See* ***United States v. Caicedo***, 47 F.3d 370, 373 (9th Cir. 1995) ("Because stateless vessels do not fall within the veil of another sovereign's territorial protection, all nations can treat them as their own territory and subject them to their laws.").)

b.

The First and Third Circuits have rejected a nexus requirement. In ***United States v. Cardales***, 168 F.3d 548 (1st Cir.), *cert. denied*, 528 U.S. 838 (1999), the First Circuit considered an MDLEA prosecution, pursuant to Venezuela's consent, of crew members of a Venezuelan vessel boarded and searched 150

8

miles south of Puerto Rico. *Id.* at 551-52. In addressing whether the Due Process Clause required a nexus, **Cardales** noted, as had the Ninth Circuit in **Davis**: "To satisfy due process, our application of the MDLEA must not be *arbitrary or fundamentally unfair*". *Id.* at 553 (emphasis added).

"In determining whether due process [was] satisfied", **Cardales** consulted international law principles for "guid[ance]" and concluded that the MDLEA satisfies both the "territorial principle", under which "a 'state has jurisdiction to prescribe and enforce a rule of law in the territory of another state to the extent provided by international agreement with the other state'", *id.* (quoting **United States v. Robinson**, 843 F.2d 1, 4 (1st Cir.), *cert. denied*, 488 U.S. 834 (1988)), and, especially, the "protective principle", under which a state may "'assert jurisdiction over a person whose conduct outside the [state's] territory threatens the [state's] security'", *id.* (quoting **Robinson**, 843 F.2d at 3).

Concerning the protective principle, **Cardales** observed that Congress had expressly found that "'trafficking in controlled substances aboard vessels is a serious international problem and is universally condemned[, and] ... presents a specific threat to the security ... of the United States'". *Id.* (alteration in original; quoting 46 U.S.C. App. § 1902). In that light, **Cardales** held due process did not require the Government to prove a nexus.

9

> When the foreign flag nation consents to the application of United States law, jurisdiction attaches under the statutory requirements of the MDLEA without violation of due process or the principles of international law because the flag nation's consent eliminates any concern that the application of United States law may be arbitrary or fundamentally unfair.

*Id.*

The court was careful, however, to note that it *did not* view the MDLEA as a congressional override of international law. *Id.* at 553 n.2. "To the extent ... international law requires a nexus to the United States, that nexus requirement ... is satisfied by the foreign flag nation's authorization to apply U.S. law to the defendants [the territorial principle] and by the congressional finding that drug trafficking aboard vessels threatens the security of the United States [the protective principle]." *Id.*

The Third Circuit (which earlier rejected a nexus requirement for MDLEA prosecutions involving *stateless vessels*, *see* **United States v. Martinez-Hidalgo**, 993 F.2d 1052 (3d Cir. 1993), *cert. denied*, 510 U.S. 1048 (1994)), follows a similar approach. **United States v. Perez-Oviedo**, 281 F.3d 400 (3d Cir. 2002), involved the MDLEA prosecution of a foreign captain of a Panamanian-registered vessel, which was sailing from Colombia to Canada when intercepted by the Coast Guard north of Trinidad and Tobago. *Id.* at 401. After Panama waived objection, a search uncovered over two tons of cocaine. *Id.*

10

After noting that "'§ 1903(d) [(providing that "a failure to comply with international law shall not divest a court of jurisdiction or otherwise constitute a defense")] expresses the necessary congressional intent to override international law to the extent that international law might require a nexus to the United States'", *id.* at 403 (quoting *Martinez-Hidalgo*, 993 F.2d at 1056), the court held that no due process violation occurred from the MDLEA's extraterritorial application because "drug trafficking is condemned universally by law-abiding nations", *id.*, and "[t]he Panamanian government expressly consented to the application of the MDLEA", *id.* The court found the second fact particularly compelling: "Such consent from the flag nation eliminates a concern that the application of the MDLEA may be arbitrary or fundamentally unfair". *Id.*

c.

In addition, in *United States v. Mena*, 863 F.2d 1522 (11th Cir.), *cert. denied*, 493 U.S. 834 (1989), while not expressly ruling on a nexus requirement *vel non*, the Eleventh Circuit upheld the MDLEA against a due process challenge for vagueness. *Mena* involved the prosecution, with Honduran consent, of foreign defendants arrested aboard a Honduran vessel in international waters east of the Bahamas. The defendants claimed as unconstitutionally vague § 1903's term "vessel subject to the jurisdiction of the United States".

11

Noting that due process requires "[s]tatuory language [to] convey 'sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices[]'", *id.* at 1527 (quoting *Jordan v. DeGeorge*, 341 U.S. 223, 231-32 (1951)), the court concluded:

> There is nothing vague about the statute. Congress has provided clear notice of what conduct is forbidden.... Those embarking on voyages with holds laden with illicit narcotics, *conduct which is contrary to laws of all reasonably developed legal systems*, do so with awareness of the risk that their government may consent to enforcement of the United States' law against the vessel.

*Id.* (emphasis added; quoting *United States v. Gonzalez*, 776 F.2d 931, 940-41 (11th Cir. 1985)). As discussed *infra*, the same is true for those who conspire to commit an offense proscribed by the MDLEA.

### B.

The opinions by these circuits do not discuss several sources of law which, although not dispositive of the present issue, provide us great assurance that, "where the flag nation has consented or waived objection to the enforcement of United States law by the United States", § 1903(c)(1)(C), due process does not require a nexus for the MDLEA's extraterritorial application. Those sources include: the Constitutional Convention debate surrounding the Piracies and Felonies Clause ("The Congress shall have Power ... [t]o define and punish Piracies and Felonies

12

committed on the high Seas, and Offenses against the Law of Nations"); the earliest exercise of Congressional power under the clause; and Supreme Court opinions reviewing that exercise.

1.

Concerning the Piracies and Felonies Clause, the Committee of Detail's draft Constitution, submitted to the Convention on 6 August 1787, would have empowered Congress "[t]o *declare* the law and punishment of piracies and felonies committed on the high seas, and the punishment of counterfeiting the coin of the United States, and of offences against the law of nations".  2 RECORDS OF THE FEDERAL CONVENTION OF 1787 182 (Max Farrand ed., 1999) (emphasis added). Subsequent debate over the clause primarily concerned the propriety of granting the power to both punish *and* declare and whether the latter power should read "declare", "designate", or "define". *See id.* at 315-16.

There was apparently no debate regarding constraints *vel non* on the clause's extraterritorial reach.  It would seem that, had they been of concern, the matter would have been discussed, especially because the clause contains "the only specific grant of power to be found in the Constitution for the punishment of offenses outside the territorial limits of the United States". CONGRESSIONAL RESEARCH SERVICE, LIBRARY OF CONGRESS, THE CONSTITUTION OF THE UNITED STATES, ANALYSIS AND INTERPRETATION, S. DOC. NO. 103-6, at 304

13

(Johnny H. Killian & George A. Costello eds., 1992) (S. Doc. No. 103-6).

The First Congress promptly enacted far-reaching legislation under the Piracies and Felonies power. In April 1790, approximately seven months *after* proposing the Bill of Rights to the States (25 September 1789), Congress approved An Act for the Punishment of Certain Crimes Against the United States (1790 Act). It provides, in part: in § 8, "[t]hat if *any person or persons* shall commit upon the high seas ... murder or robbery, ... every such offender shall be ... adjudged ... a pirate and felon, and being thereof convicted, shall suffer death"; and, in § 12, "[t]hat if *any* ... *person* shall commit manslaughter upon the high seas, ... such person ... so offending, and being thereof convicted, shall be imprisoned not exceeding three years, and fined not exceeding one thousand dollars". Act of 30 Apr. 1790, ch. 9, 1 Stat. 112, 113-15 (emphasis added).

For purposes of this appeal, perhaps the most striking aspect of the 1790 Act is that many of its provisions regarding crimes on the high seas apply to "*any* person". (Emphasis added.) It is important to note, especially in a case in which at issue is the constitutionality of another exercise of the Piracies and Felonies power, that, at the time it passed the 1790 Act, the First Congress had already drafted the Fifth Amendment and proposed it to the States.

14

While that Amendment was not ratified until 15 December 1791, during "[t]he debates [in August 1789 for] what became the Fifth Amendment ... there was no hint ... of any intention, by the adoption of that amendment, to deprive Congress of this [Piracies and Felonies] power expressly and uncontroversially granted to it by the Convention".  A. Mark Weisburd, *Due Process Limits on Federal Extraterritorial Legislation?*, 35 COLUM. J. TRANSNAT'L L. 379, 421 (1997) (citing 1 ANNALS OF CONG. 753 (Joseph Gales ed., 1789)).  In this regard, the First Congress, which drafted the 1790 Act and the Amendment, "included 20 Members who had been delegates to the [Constitutional] Convention".  **Bowsher v. Synar**, 478 U.S. 714, 724 n.3 (1986).

2.

Early Supreme Court opinions addressing extraterritorial applications of the 1790 Act intimate that the Fifth Amendment imposes no nexus requirement on the reach of statutes criminalizing felonious conduct by foreign citizens on the high seas.  In **United States v. Palmer**, 16 U.S. 610 (1818), the Court considered, *inter alia*, whether the United States had jurisdiction, pursuant to § 8 of the 1790 Act, to try, and punish, foreign citizens who had, on the high seas, boarded and robbed a foreign-owned vessel manned by a Spanish crew.

In answering "whether th[e] act extends farther than to American citizens, or to persons on board American vessels, or to

offences committed against citizens of the United States", *id.* at 630, Chief Justice Marshall stated for the Court:

> *The constitution having conferred on congress the power of defining and punishing piracy*, there can be no doubt of the right of the legislature to enact laws punishing pirates, *although they may be foreigners, and may have committed no particular offence against the United States. The only question is, has the legislature enacted such a law?* Do the words of the act authorize the courts of the Union to inflict its penalties on persons who are not citizens of the United States, nor sailing under their flag, nor offending particularly against them?

*Id.* at 630-31 (emphasis added).

The Court answered in the negative. After emphasizing the generality of the language employed by the 1790 Act in setting its reach (*e.g.*, "any captain, or mariner of any ship or vessel"; "any seaman"; "any person or persons"), the Court stated: "Every nation provides for such offense[s] the punishment its own policy may dictate, and *no general words of a statute ought to be construed* to embrace them when committed by foreigners against a foreign government". *Id.* at 632-33 (emphasis added). Therefore, the Court concluded that, as a *statutory* matter, "the crime of robbery, committed by a person on the high seas, on board of any ship or vessel belonging exclusively to subjects of a foreign state, on persons within a vessel belonging exclusively to subjects of a foreign state, *is not a piracy within the true intent and meaning of the act*". *Id.* at 633-34 (emphasis added).

16

*Palmer* is an illustration of the well-established canon of construction espoused by Chief Justice Marshall in *Murray v. The Schooner Charming Betsy*, 6 U.S. 64 (1804): "[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains...." *Id.* at 118. Later, the Court emphasized in *Lauritzen v. Larsen*, 345 U.S. 571 (1953), however, that this canon "is not, as sometimes is implied, any impairment of our own sovereignty, or limitation of the power of Congress". *Id.* at 578.

While the constraints *vel non* imposed by the Fifth Amendment on extraterritorial application of laws enacted pursuant to the Piracies and Felonies Clause may not have been directly at issue in *Palmer*, Chief Justice Marshall's assessment of the relevant inquiry regarding extraterritorial applications — "The constitution having conferred on congress the power of defining and punishing piracy, ... [t]he only question is, has the legislature enacted such a law?" — arguably removes any doubt that such enactments comport with the Fifth Amendment. And while at issue was Congress' power to define and punish *piracies*, Chief Justice Marshall's assessment should apply with equal weight to *felonies* such as at issue here, a parallel provision within the same constitutional clause.

Other case law interpreting the 1790 Act suggests international law principles are in some way inherent in the Piracies and Felonies Clause. In *United States v. Furlong*, 18 U.S.

17

184 (1820), the Court considered, in *dictum*, whether Congress could punish a murder, committed upon the high seas, by one foreign crew member against another aboard a foreign vessel. *Id.* at 193-98. Justice Johnson opined for the Court: "I am led to the conclusion, that [§ 8 of the 1790 Act] does not extend the punishment for murder to the case of that offence committed by a foreigner upon a foreigner in a foreign ship. But otherwise as to piracy, *for that is a crime within the acknowledged reach of the punishing power of Congress*". *Id.* at 197 (emphasis added).

Addressing the fact that, in § 8 of the 1790 Act, Congress had declared murder committed upon the high seas to be piracy, Justice Johnson further concluded: "[Murder and piracy] are things so essentially different in their nature, that not even the omnipotence of legislative power can confound or identify them". *Id.* at 198. He continued:

> If, by calling murder *piracy*, it might assert a jurisdiction over that offence committed by a foreigner in a foreign vessel, what offence might not be brought within their power by the same device? *The most offensive interference with the governments of other nations might be defended on the precedent.* Upon the whole, I am satisfied that Congress [did not] intend[] to punish murder *in cases with which they had no right to interfere....*

*Id.* at 198 (first emphasis in original).

In short, it appears Justice Johnson thought Congress' Piracies and Felonies power extends *only so far* as permitted by

18

international law.  That position may be at loggerheads, however, with more recent pronouncements by the Court.  *See, e.g.*, **Lauritzen**, 345 U.S. at 578 (as discussed *supra*, noting that the canon of construction announced in **The Charming Betsy** "is not, as sometimes is implied, any impairment of our own sovereignty, or limitation of the power of Congress"); **Hartford Fire Ins. Co. v. California**, 509 U.S. 764, 815 (1993) (Scalia, J., dissenting in part) ("*Though it clearly has constitutional authority to do so*, Congress is generally presumed not to have exceeded those customary international-law limits on jurisdiction to prescribe." (Emphasis added.)).

The opinions addressing the reach of the 1790 Act are of significance to our consideration of the MDLEA's reach.  Those opinions concern an exercise of power, pursuant to the Piracies and Felonies Clause, by a Congress which, as noted, had some members who had drafted that clause, the 1790 Act, *and* the Fifth Amendment. While none of these cases addresses whether the Fifth Amendment has any applicability to exercises of power under the Piracies and Felonies Clause, neither the Fifth Amendment generally, nor its Due Process Clause specifically, was flagged as an issue in any of them.  In fact, in addressing an 1819 law providing for the punishment of piracy on the high seas, the Court noted that, "notwithstanding a series of contested adjudications on [§ 8 of the 1790 Act], *no doubt has hitherto been breathed of its conformity to*

19

*the constitution*". **United States v. Smith**, 18 U.S. 153, 158 (1820) (emphasis added).

3.

In the light of this rich history, and for the issue at hand, it is not necessary to decide whether the Due Process Clause imposes *no* constraints on the extraterritorial application of the MDLEA. For example, in previously considering whether a predecessor to the MDLEA required a nexus for stateless vessels, our court noted:

> [G]iven the clear authority of Congress in the premises, [citing the Piracies and Felonies Clause], the relevance of international law to the problem at hand is as a reflection of Congressional intent rather than as a limitation on the power of Congress, *at least where, as here, there is no basis for any claim of due process violation*.

**United States v. Alvarez-Mena**, 765 F.2d 1259, 1266 (5th Cir. 1985) (emphasis added).

Accordingly, we hold that, for the MDLEA issue at hand, and to the extent the Due Process Clause may constrain the MDLEA's extraterritorial reach, that clause does not impose a nexus requirement, in that Congress has acted pursuant to the Piracies and Felonies Clause. Again, that clause is "the only specific grant of power to be found in the Constitution for the punishment of offenses outside the territorial limits of the United States". S. Doc. No. 103-6, at 304.

C.

20

Assuming, *arguendo*, that resolution of this issue does require consulting international law, the MDLEA's application to Suerte still passes constitutional muster because, on these facts, international law does not require a nexus.

1.

Malta, under whose flag Suerte's vessel was registered, consented to the boarding and search of his vessel, as well as to the application of United States law. A flag nation's consent to a seizure on the high seas constitutes a waiver of that nation's rights under international law. *See United States v. Williams*, 617 F.2d 1063, 1090 (5th Cir. 1980) (en banc). "[I]nterference with a ship that would otherwise be unlawful under international law is permissible if the flag state has consented". RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 522 cmt. e (1987); *see also Robinson*, 843 F.2d at 4.

Along this line, and as noted, the MDLEA provides: "[A] 'vessel subject to the jurisdiction of the United States' includes ... a vessel registered in a foreign nation where the flag nation has consented or waived objection to the enforcement of United States law by the United States". 46 U.S.C. App. § 1903(c)(1)(C). This codifies the above-described generally accepted principle of international law: a flag nation may consent to another's jurisdiction. *See* RESTATEMENT (THIRD) § 522 reporters note 8 (the MDLEA "*confirmed the practice*" of relying on informal grants of

21

consent by flag nations (emphasis added)); THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 3-12 n.41 (3d ed. 2001) (the principle that flag-nation consent satisfies international law requirements "is *confirmed* by the MDLEA" (emphasis added)).  Such an agreement between the United States and a flag nation to apply United States law on a flag-nation vessel may be made informally.  ***Robinson***, 843 F.2d at 4; *see also* RESTATEMENT (THIRD) § 301 & cmt. b. (international agreements need not be formalized, nor need they be in writing).

2.

Maintaining that Malta's consent is irrelevant, Suerte asserts that, because no drugs were found on his vessel, he was not in violation of United States law when his vessel "was converted in effect to American territory" by Malta's consent.

a.

This claim has no merit.  As noted earlier, we held recently: "The only statutory prerequisite to the district court's jurisdiction under section 1903(c)(1)(C) is that the flag nation consent to the enforcement of United States law *before trial*".  ***Bustos-Useche***, 273 F.3d at 627 (emphasis added).

b.

Even accepting Suerte's contention, we note he was not charged with drug possession; instead, he was charged with *conspiracy* to possess with intent to distribute.  "A conspiracy is 'an agreement by two or more persons to commit one or more unlawful acts and an

22

overt act by one of the conspirators in furtherance of the conspiracy.'" *United States v. Thomas*, 12 F.3d 1350, 1356 (5th Cir.) (quoting *United States v. Romeros*, 600 F.2d 1104, 1106 (5th Cir. 1979), *cert. denied*, 444 U.S. 1077 (1980)), *cert. denied*, 511 U.S. 1114 (1994). "If the totality ... of evidence is adequate to show a concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose[,] then the conspiracy may be found." *United States v. Perez*, 489 F.2d 51, 61 (5th Cir. 1973), *cert. denied*, 417 U.S. 945 (1974).

As alleged by the Government: meetings during which Suerte agreed to receive and transport the cocaine occurred in Venezuela; he was working with others with a single design for a common purpose *at the time the United States requested and received permission from Malta* to board and search his vessel; and, he was then acting in furtherance of that common purpose — he was assisting and awaiting the second attempt to load cocaine by positioning his vessel in the vicinity of the coordinates provided by the telex (found in the search of his cabin) designating the location for that attempt.

In this light, application of the MDLEA to Suerte is permissible; a nexus between his conduct and the United States is not required. Rejecting a nexus requirement will not result in the

23

unrestrained, global law enforcement by the United States decried by Suerte.

Again, the power "to define and punish Piracies and Felonies committed on the high seas, and Offenses against the Law of Nations" is "the *only* specific grant of power to be found in the Constitution for the punishment of offenses outside the territorial limits of the United States". S. Doc. No. 103-6, at 304 (emphasis added). The MDLEA represents an extremely limited exercise of that power. For certain persons not aboard United States vessels or in United States customs waters, it proscribes drug trafficking only aboard a stateless vessel or, as in the case at hand, a vessel whose flag nation consents to enforcement of United States law.

Enforcement of the MDLEA in these circumstances is neither arbitrary nor fundamentally unfair (the due process standard agreed upon by Suerte and the Government). Those subject to its reach are on notice. In addition to finding "that trafficking in controlled substances aboard vessels ... presents a specific threat to the security and societal well-being of the United States", Congress has also found that such activity "is a serious *international* problem and is *universally* condemned". 46 U.S.C. App. § 1902 (emphasis added). Along this line, the United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, *opened for signature* 20 Dec. 1988, 28 I.L.M. 493, to which Malta and the United States are signatories, provides as its

24

purpose:  "to promote cooperation among the Parties so that they may address more effectively the various aspects of illicit traffic in narcotic drugs and psychotropic substances having an international dimension".  *Id.* art.2.

                                    III.

For the foregoing reasons, we **VACATE** the dismissal of the indictment in this case and **REMAND** for further proceedings.

*VACATED and REMANDED*