# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 20, 2011

No. 10-31093
Summary Calendar

Lyle W. Cayce
Clerk

MS TABEA SCHIFFAHRTSGESELLSCHAFT MBH & CO. KG,

Plaintiff

v.

BOARD OF COMMISSIONERS OF THE PORT OF NEW ORLEANS,

Defendant-Third Party Plaintiff–Appellant

v.

UNITED STATES OF AMERICA,

Defendant-Third Party Defendant–Appellee

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:08-CV-3909

Before WIENER, PRADO, and OWEN, Circuit Judges.

PER CURIAM:[*]

This case concerns the United States's liability for the U.S. Army Corps
of Engineers's ("Corps") alleged failure to warn the Board of Commissioners of
the Port of New Orleans ("Board") about navigation hazards that caused the ship

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

No. 10-31093

MSC Turchia to allide with the Napoleon Avenue Wharf on June 2, 2008. The Board appeals the district court's final judgment in favor of the United States after a bench trial on the merits. It maintains that the district court erred when it found that the United States, through the Corps, was not liable for failing to warn the Board of known navigation hazards. It contends that the district court's determination that the Corps exercised due care was clear error because the shoal that allegedly caused the Turchia to ground and allide with the wharf was known to the Corps, and the Corps was negligent in providing information about the shoal and by not immediately calling the Board when it knew about the shoal. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Board owns the Napoleon Avenue and Nashville Avenue Wharves on the Mississippi River in the Port of New Orleans. Through "sounding" technology acquired in 2005, it has the ability to conduct "cross-section" surveys of areas of the river, producing a contour map showing water depth up to 1,000 feet from a wharf. It conducted these surveys off the Napoleon Avenue Wharf on March 4, 2008, and again several days after the accident, on June 6, 2008. The Board also performs a "line survey" on a weekly basis that shows water depth but only along a line approximately twenty feet off the wharf's face.

The Corps also conducts line surveys approximately one to six times a month, but at a distance of approximately 150 feet off the wharf's face. Relevant to this case, the Corps performed these surveys on April 23, 2008, April 29, 2008, May 12, 2008, and May 29, 2008. The Corps's line surveys provide both a profile view indicating water depth along the survey line, and an aerial view of the river and of the survey line. The Corps considers this survey adequate to determine the navigability of the water in the area immediately beyond the survey line, and thus whether dredging is required. Relevant to this case, the May 29 survey was plotted on May 30.

2

No. 10-31093

The Corps provides its line survey and other relevant information to the Board and other "stakeholders" in several mediums. First, the Corps publishes the line surveys on its website shortly after plotting them. Here, the district court found that the survey was available on the Corps website prior to the accident at issue. The viewing software used to view the surveys is available for free to the general public through the Corps's website. That software provides the user the ability to zoom in and out and scroll on the survey. It also provides a link to help viewers unfamiliar with the software. Michelle Ulm, the Corps's operations manager, testified that she also receives phone calls from users with questions about how to use the software.

Additionally, the Corps sends hard copies of the survey to the Board by mail. Both Ulm and Bachvan "Cindy" Doan, a Corps employee who produces the survey, testified that the Corps sends out the hard copies every time it completes a new survey. While Jimmy Hankins, the Board's Marine Terminal Superintendent in charge of assigning berths to incoming vessels, testified that he only receives hard-copy surveys every few months, the district court found that "the credible evidence is that the Corps mails out the hard copies every time it produces a survey." *MS Tabea Schiffahrtsgesellschaft MBH & Co. KG v. Bd. of Comm'rs of Port of New Orleans*, No. 08-CV-3909, 2010 WL 3923168, at *4 (E.D. La. Sept. 29, 2010).

Finally, the Corps also conducts a monthly Mississippi River Maintenance Forum meeting to review river conditions. The meetings are run by Ulm, who has the line surveys on hand, and discusses current or planned dredging, upcoming Corps projects, and takes questions from participants. Hankins and other Board employees were listed in 2008 as members of the Forum and were invited to the meetings. The meeting attendance records show that no Board officials attended the meetings held from January–May 2008.

3

The Corps usually dredges in the area of the Napoleon Avenue Wharf once or twice a year, and dredges from about 100 feet from wharf's face to the deepwater navigation channel. It dredges this area to minus thirty-five feet Mean Low Gulf ("MLG"), which is known as the project depth. One can calculate actual depth after dredging by adding the project depth to the applicable river gauge reading. The Corps awarded a dredging contract for the New Orleans Harbor spanning six miles on May 7, 2008, and on May 8, the Corps issued a Navigation Bulletin setting out the dredging timeline. Next, the Corps held a Preconstruction Conference on May 12, 2008, to discuss the dredging contract, including where the dredging was going to occur. Chris Wyckoff, the Board's dredge manager, attended the meeting but Hankins did not. Additionally, the district court found that Ulm called the Board after the Corps awarded the contract and spoke to either Hankins or Wyckoff to discuss the areas the Corps planned to dredge, the Board's priorities, and logistical issues. It also found that the Board did not "have a custom or practice of calling the Dock Board to specify that a Corps survey reveals shoals along the line 150 feet off the face of the wharf." *MS Tabea*, 2010 WL 3923168 at *4.

The incident at the center of the dispute began when on May 28, 2008, the Turchia's owner filed a berth application on behalf of the Turchia with the Board. That application specified that the ship requires forty-five feet of water at berth. Hankins assigned the Turchia to the Nashville Avenue Wharf Section C. The district court found that "[t]he credible evidence is that before he did so, Mr. Hankins referred only to the [Board's] 20-foot profile survey to determine whether the Port could offer the water depth requested by a vessel." *Id.* at *5. On June 2, 2008, the Turchia grounded near the Napoleon Avenue and Nashville Avenue Wharves. A computer reconstruction prepared by Captain Brian Boyce indicates that the Turchia's bow swung to the right and its starboard side allided with the Napoleon Avenue Wharf, and that "pivot point" where it grounded was

about 320 feet from the wharf.  This means that the grounding point was about 140 feet past the Corps survey line, which was about 180 feet from the wharf.

On July 10, 2008, the Turchia's owner, MS Tabea Schiffahrtsgesellschaft MBH & Co. KG ("Tabea"), sued the Board for damages to the ship in the U.S. District Court for the Eastern District of Louisiana.  On December 9, 2008, the Board counterclaimed against Tabea and the Turchia for damages to the wharf, and simultaneously filed a third-party complaint against the United States alleging several claims for damages.  Tabea cross-claimed against the United States as well.  On February 24, 2010, the district court granted the Government's motion to dismiss all claims except the failure-to-warn claim, and on April 7, 2010, it denied the Government's motion for summary judgment on that claim.  Before trial, the Board and Tabea settled all claims against each other and Tabea also withdrew its claim against the Government.  The district court tried the case without a jury, and issued Findings of Fact and Conclusions of Law on September 29, 2010, and issued judgment against the Board on October 1, 2010.  The Board timely appealed.

## II. DISCUSSION

### A.     Standard of Review

In an admiralty action tried by the district court without a jury, we review findings of fact for clear error and questions of law de novo.  *See Theriot v. United States*, 245 F.3d 388, 394 (5th Cir. 1988) (citing *Coumou v. United States*, 107 F.3d 290, 295 (5th Cir.), *modified*, 114 F.3d 64 (1997)).  "The district court's rulings on negligence, cause, and proximate cause are findings of fact, while its determination of the existence of a legal duty is a question of law."  *Id.* at 394–95 (quoting *Coumou*, 107 F.3d at 295).  Under clear error review, the district court's "factual determinations will stand so long as they are plausible—even if we would have weighed the evidence otherwise."  *Id.* at 395 (quoting *Schlesinger v. Herzog*, 2 F.3d 135, 139 (5th Cir. 1993) (internal quotation marks omitted)).

No. 10-31093

## B.    Failure-to-Warn Claim

The Board challenges each of the independent bases the district court provided for its ruling. First, it contests the district court's finding that the "weight of the evidence indicates that the Corps may not have had actual knowledge of the shoals on which the Turchia grounded." *MS Tabea*, 2010 WL 3923168, at \*10. The Board claims that when compared to the Corps's May 29 survey, the cross-section survey completed on June 6 by its employee, Ronald Partrdige, establishes that the shoal that appeared in the Board's survey was the same one on which the Turchia grounded. Second, the Board challenges the district court's finding that the Corps took due care by using several adequate measures to disseminate the line-survey it conducted. It argues that the Corps's failure to call and warn the Board of the shoal on the same day it obtained the survey data was a breach of its duty of due care. Third, it also disputes the district court's conclusion that Hankins and the Board did not rely on the Corps's survey data, thereby defeating a necessary element of its claim.

On appeal, the Government does not dispute the district court's conclusion that the Corps has undertaken a duty to help ensure the safety and navigability of the harbor. We have previously established that the Corps's duty in claims brought under the Suits in Admiralty Act, 46 U.S.C. §§ 30901–30918, is the same as "that of a private person in like circumstances," which is due care. *Transorient Navigators Co., S.A. v. M/S SOUTHWIND*, 714 F.2d 1358, 1364–65 (5th Cir. 1983) (quoting *S. Natural Gas v. Pontchartrain Materials, Inc.*, 711 F.2d 1251, 1254 (5th Cir. 1983)). We have also held that where "the Government had no prior knowledge of the existence of the shoal [that] caused the accident," it may not be held that its failure to warn was in dereliction of its duty of due care. *Canadian Pac. (Berm.) Ltd. v. United States*, 534 F.2d 1165, 1169 (5th Cir. 1976). Further, our precedent establishes that "[e]vidence of reliance is necessary to establish that governmental negligence was a cause of the injury."

No. 10-31093

*Sheridan Transp. Co. v. United States*, 834 F.2d 467, 474 (5th Cir. 1987) (citing *Cent. Rivers Towing, Inc. v. City of Beardstown*, 750 F.2d 565, 572 (7th Cir. 1984)).

The Board argues that the district court erred by finding that the evidence "indicates that the Corps may not have had actual knowledge of the shoals on which the Turchia grounded." *MS Tabea*, 2010 WL 3923168, at *10. It notes that its cross-section survey indicates that the shoal that grounded the Turchia was the only shoal in the area of sufficient height and size to ground the ship, and therefore the shoal that appeared on the Corps's line survey must have been the same shoal. While this may be correct, the district court found that the connection between the shoaling at the Corps's survey line and the shoaling 140 feet away where the Turchia grounded was tenuous based on the evidence it examined. Even if correct, the Board acknowledges that the Corps may not have known how large the shoal was, and thus that it extended to where the Turchia grounded. Therefore, the Board has failed to sufficiently establish that the Corps knew of the shoal at the point were the Turchia grounded such that the district court's conclusion was implausible.

Even if the Corps did have knowledge of the shoal, the district court did not clearly err in concluding that the Corps exercised due care in the way it distributed the survey, especially given the Board's lack of diligence. The Board insists that the surveys published on the Corps's website are unreadable, that it did not receive the paper survey showing the shoal before the accident, and that anything except a phone call to the Board constituted a breach of the Corps's duty of due care. The Board notes that several witnesses testified they had difficulty reading the surveys on the website, including an employee of the Corps. The district court noted, however, that there were several ways in which users could obtain help in reading the survey, including by calling Ulm, and noted that Ulm testified that she could read the survey with ease. While there

7

is certainly evidence that some individuals might find the online version of the survey difficult to read, the district court's decision that the information proffered was sufficient was still supported by Ulm's testimony and by the several manners in which the Corps disseminated the information. Therefore, the district court's decision cannot be clearly erroneous. *See Theriot*, 245 F.3d at 395 (noting that the district court's factual determinations are not clearly erroneous so long as they are plausible).

Additionally, the district court found that Hankins, who was responsible for assigning a berth to the Turchia, did not rely on the Corps's survey data. Therefore, even if the website was difficult to use and the hard copy from the May 29 survey had not arrived, Hankins did not avail himself of the resources provided by the Corps. The Board's protestations otherwise are belied by Hankins's own testimony that he consulted only the Board's own twenty-foot line survey. Despite the Board's contentions that other evidence shows that it did use the Corps's surveys, the district court's decision to credit or not credit witness testimony deserves great deference. *See id.* ("Where the court's finding is based on its decision to credit the testimony of one witness over that of another, that finding, if not internally inconsistent, can virtually never be clear error.") (internal quotation marks omitted) (quoting *Schlesinger v. Herzog*, 2 F.3d 135, 139 (5th Cir. 1993)). Therefore, without reliance on the Corps's surveys, the Board's claim must fail regardless of any shortcomings in the Corps's knowledge-sharing system. See *Sheridan Transp. Co.*, 834 F.2d at 474.

Finally, the Board's argument that only an immediate phone call to warn of the shoal could constitute due care is unavailing. The record contains testimony that shoaling is a common phenomenon in the Harbor and that the Corps has no knowledge of when particular vessels with particular depth requirements plan on docking at the wharves. This information is within the control of the Board. Therefore, the Corps had no reason to pay special concern

to the evidence of shoaling in its line survey beyond its normal efforts in disseminating survey information. It provided this information through several channels to its stakeholders, and the Board failed to take advantage of this information. As the district court noted, the Board also had the equipment to conduct its own, far more comprehensive, sounding surveys and had not recently done so. The findings made by the district court indicate that the Corps undertook multifaceted efforts to provide information about the navigability of the harbor, and that it lacked information about the needs of particular vessels or the timing of their docking. Given this, the district court's finding that the Corps exercised due care, and thus implicitly was not required to call the Board, is not clear error.

### III. CONCLUSION

Because the district court's finding that the Corps exercised due care was not clearly erroneous, it correctly found that the United States was not liable for the accident, and we affirm its decision.

AFFIRMED.