# United States Court of Appeals
## For the First Circuit

No. 08-1028

UNITED STATES OF AMERICA,

Appellee,

v.

JOSÉ DEL CARMEN CARDALES-LUNA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Torruella, Selya, and Lipez, Circuit Judges.

José R. Olmo-Rodríguez for appellant.
Germán A. Rieckehoff, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and Nelson Pérez-Sosa, Assistant United States Attorney, were on brief, for appellee.

January 20, 2011

**LIPEZ**, **Circuit Judge**.  Our opinion in United States v. Angulo-Hernández, 565 F.3d 2 (1st Cir. 2009), describes the facts underlying this Maritime Drug Law Enforcement Act (MDLEA) appeal. Appellant José del Carmen Cardales-Luna was one of eight crew members serving on the Bolivian flag vessel Osiris II when it was boarded by the United States Coast Guard in international waters on February 4, 2007.  In the course of a six-day search of the Osiris II, Coast Guard officers discovered 400 kilograms of cocaine, twenty-five kilograms of heroin, and a machine gun hidden in a compartment near the rear of the vessel.  Cardales-Luna and his seven fellow crew members were subsequently charged in a three-count superseding indictment with (1) conspiracy to possess with intent to distribute the drugs found on the Osiris II, see 46 U.S.C. § 70506(b); (2) aiding and abetting the possession of those drugs with intent to distribute, see 46 U.S.C. § 70503(a)(1), 18 U.S.C. § 2(a); and (3) aiding and abetting the possession of a machine gun in furtherance of a drug trafficking crime, see 18 U.S.C. §§ 2(a), 924(c)(1)(B)(ii).

The other seven crew members were tried jointly.  The jury found four of them guilty on all counts and three not guilty on all counts.  We affirmed the four convictions in Angulo-Hernández, a set of appeals that focused on whether the government had presented sufficient evidence to prove that the defendants knew the drugs were hidden on the vessel.  See 565 F.3d

-2-

at 7-9.  For reasons that are not clear from the record, Cardales-Luna was tried separately from his co-defendants.  After a one-day trial, the second jury found Cardales-Luna guilty on all three counts.  At sentencing, the court dismissed the gun charge, as it had at the sentencing of the defendants found guilty in the Angulo-Hernández trial.  This appeal followed.

## I.

Cardales-Luna contends that the government proved only that he was present on a vessel that happened to be carrying drugs, not that he knowingly possessed those drugs with the intent to distribute.  We considered and rejected the same sufficiency of the evidence argument in Angulo-Hernández, where we held that the circumstantial evidence was sufficient for the jury to infer knowledge.  565 F.3d at 9.  In particular, we held that the route of the vessel, the quantity and value of the drugs, the low value and unprofessional handling of the other cargo, and evidence suggesting that the compartment containing the drugs had recently been sealed all supported a finding that the crew members knew about the drug trafficking operation.[1]  Id. at 8-9.

---

[1]    The vessel was en route from Colombia to the Dominican Republic.  The drugs -- approximately 400 bricks of cocaine and 25 bricks of heroin -- were estimated to be worth $8 million.  The cargo of 28,011 rolls of toilet paper, 207 Styrofoam coolers, and 14 pieces of office furniture was estimated to be worth $25,000. It was also stored haphazardly, suggesting that the legitimate cargo was no more than a cover for the more valuable hidden cargo. Finally, the screws securing the hatch on the hidden compartment were not tarnished, which indicated that the hatch had been

-3-

At Cardales-Luna's trial, the government offered the same circumstantial evidence that it had offered against two of the other crew members, José Luis Casiano-Jiménez and Gustavo Rafael Brito-Fernández, whose convictions we affirmed in Angulo-Hernández.[2]  Cardales-Luna did not testify at trial, nor did he offer any evidence that would favorably distinguish him from Casiano-Jiménez and Brito-Fernández.  Indeed, the one material fact distinguishing Cardales-Luna from Brito-Fernández arguably cuts in the government's favor: a Coast Guard officer testified that the other crew members appeared to treat Cardales-Luna and Casiano-Jiménez with deference, which the officer viewed as an indication that they were higher on the crew's hierarchy than the others (that is, closer to the status of the captain and engineer than the ordinary crew members).[3]  The jury could have inferred from that

---

recently sealed and made it "more likely . . . that the crew members either witnessed the loading or participated in it."  Angulo-Hernández, 565 F.3d at 8.

[2]     The evidence against the other two defendants -- the ship's captain and the engineer -- was somewhat stronger.  See Angulo-Hernández, 565 F.3d at 8-9.

[3]     The officer testified:

Of the seven crew members, two of them [Cardales-Luna and Casiano-Jiménez] stood out as being of a higher status than the other five.  They were afforded seats.  They had wooden chairs that those two individuals got to sit on.  The other five sat on the deck.

When they had meals, they were given food first.  And the general demeanor of the other five towards these seemed almost of subservience.  It seemed almost to me, from my

evidence that Cardales-Luna was more likely to know about the drug smuggling operation than Brito-Fernández.

In short, the evidence against Cardales-Luna was at least as strong as -- and materially identical to -- the evidence against Casiano-Jiménez and Brito-Fernández, which we held to be sufficient to prove knowledge in Angulo-Hernández.  There is a question, however, of what weight our decision in Angulo-Hernández should be given in this appeal.  In general, "accepted principles of stare decisis militate strongly in favor of resolving identical points in the same way for identically situated defendants."  United States v. Diaz-Bastardo, 929 F.2d 798, 799 (1st Cir. 1991).  Those principles suggest that we should follow our previous decision as a matter of stare decisis.

There are two potential difficulties with that route, however.  The first is that the government conceded at oral argument that our prior decision has no stare decisis effect here. Yet that representation, though entitled to some weight, is not binding on us.  United States v. Bucci, 582 F.3d 108, 119 n.9 (1st Cir. 2009).  As the Supreme Court has pointed out, our "judgments

---

military experience, that they were officers to their enlisted, if I could make that analogy.

Cardales-Luna presented evidence that Casiano-Jiménez had an injured foot, which Cardales-Luna says was the reason Casiano-Jiménez was given a seat at meals.  If anything, that evidence strengthens the inference that Cardales-Luna, who had no similar excuse, was treated better because he ranked higher than the other crew members.

-5-

are precedents, and the proper administration of the criminal law cannot be left merely to the stipulation of parties." Young v. United States, 315 U.S. 257, 259 (1942). A concession by the government therefore "does not relieve [us] of the performance of the judicial function." Id. at 258; see also Roberts v. Galen of Va., Inc., 525 U.S. 249, 253 (1999) (per curiam) (noting that "the concession of a point on appeal by respondent is by no means dispositive of a legal issue"). If the law requires us to adhere to Angulo-Hernández, we must adhere to it, the government's concession to the contrary notwithstanding.

The second difficulty is that there is limited authority directly addressing the role of stare decisis in the sufficiency of the evidence context. It is possible that this limited authority reflects a belief that sufficiency of the evidence rulings are categorically exempt from the ordinary rules of stare decisis. Sufficiency of the evidence rulings, after all, "generate[] no precedential force upon the decisionmaking processes of fact finders at criminal trials." United States v. Willoughby, 27 F.3d 263, 268 (7th Cir. 1994). Perhaps the same principle extends to appellate review for evidentiary sufficiency as well.

We reject that proposition. The role of an appellate court in judging the sufficiency of the evidence is fundamentally different from the role of the jury in finding the facts and determining guilt. Whereas the jury must determine whether, in its

subjective judgment, the government has overcome the presumption of innocence and eliminated any reasonable doubt that the defendant committed the charged offense, a court reviewing for sufficiency is not permitted to "make its own subjective determination of guilt or innocence." Jackson v. Virginia, 443 U.S. 307, 319 n.13 (1979). Rather, appellate courts ask "whether the evidence introduced is sufficient to convict as a matter of law (which is not to say the jury must convict, but only that, as a matter of law, the case may be submitted to the jury and the jury may convict)." Carmell v. Texas, 529 U.S. 513, 547 (2000) (emphasis altered). The question calls for a "binary response: Either the trier of fact has power as a matter of law [to make a finding of guilt] or it does not." Schlup v. Delo, 513 U.S. 298, 330 (1995).

The distinction between fact-finding and sufficiency review is important because stare decisis "deals only with law." United States v. Reveron Martinez, 836 F.2d 684, 691 (1st Cir. 1988) (internal citations and quotation marks omitted). The trier of fact is thus free to make an independent assessment of the evidence because "the facts of each successive case must be determined by the evidence adduced at trial." Id. By contrast, even the narrowest conception of stare decisis demands that two panels faced with the same legal question and identical facts reach the same outcome. See 18 James Wm. Moore et al., Moore's Federal Practice § 134.03[1] (3d ed. 2010) ("At a minimum, stare decisis

extends to the result reached by the prior authoritative decisions."); Drive Fin. Servs., L.P. v. Jordan, 521 F.3d 343, 349 (5th Cir. 2008) ("[W]hen a future case presents the same facts as a past case decided by a higher court[,] stare decisis requires that we decide those cases in a similar manner."); Tate v. Showboat Marina Casino P'ship, 431 F.3d 580, 582 (7th Cir. 2005) (noting that the holding of a case includes "the facts and the outcome").

The proposition that courts policing the legal boundaries of the fact-finder's authority must act in conformity with binding legal precedent is confirmed explicitly in a few cases. E.g., Willoughby, 27 F.3d at 268 (noting that the stare decisis effect of a prior panel decision extends to "other appellate tribunals in the same jurisdiction faced with comparable challenges to the sufficiency of the evidence"); United States v. Gillis, 942 F.2d 707, 711 (10th Cir. 1991) (holding that a previous panel decision "is stare decisis on the issue of sufficiency of the evidence to support this conviction"). It is also implicit in many others. E.g., United States v. Johnson, 519 F.3d 478, 485-86 (D.C. Cir. 2008) (affirming conviction on the ground that "[t]he evidence introduced in this case is indistinguishable from evidence we have previously held sufficient"); United States v. Hernandez, 141 F.3d 1042, 1055-56 (11th Cir. 1998) (reversing conviction on the ground that the evidence was indistinguishable from evidence previously held insufficient).

-8-

There are of course limits to stare decisis, which we have catalogued in numerous cases.  See, e.g., United States v. Rodríquez, 527 F.3d 221, 224-25 (1st Cir. 2008); EEOC v. Trabucco, 791 F.2d 1, 4 (1st Cir. 1986).[4]  Most relevantly for our purposes, "a decision dependent upon its underlying facts is not necessarily controlling precedent as to a subsequent analysis of the same question on different facts and a different record."  Gately v. Massachusetts, 2 F.3d 1221, 1227 (1st Cir. 1993).  That rule is no more than a restatement of the familiar idea that prior cases are often distinguishable on their facts.  It also likely explains why stare decisis is so infrequently invoked by name in sufficiency of the evidence cases.  As a practical matter, the evidence in one case is rarely duplicated in a subsequent case, and so precedents in the sufficiency of the evidence arena tend to serve primarily as rough guides that can be likened or distinguished according to the accepted norms of legal reasoning.  Yet even accepting that there are legitimate grounds for distinguishing cases on the basis of materially different facts, cf. Trabucco, 791 F.2d at 2 (noting that stare decisis "leaves some room for judgment as to its

---

[4]    Particularly vexing problems arise when two binding precedents are in conflict.  See, e.g., Reveron Martinez, 836 F.2d at 693 (Torruella, J., concurring in part and dissenting in part). Some other circuits have held that "where two previous holdings or lines of precedent conflict[,] the earlier opinion controls and is the binding precedent."  Rios v. City of Del Rio, 444 F.3d 417, 425 n.8 (5th Cir. 2006).  We need not address that issue here. Angulo-Hernández is the only precedent at issue.

-9-

preclusive power"), it remains true that a panel may not disregard binding precedent simply out of disagreement. See Lacy v. Gardino, 791 F.2d 980, 984-85 (1st Cir. 1986).

Therefore, it would be no small matter to find that an area of the law was categorically exempt from the constraining force of precedent. Stare decisis is always "the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." Payne v. Tennessee, 501 U.S. 808, 827 (1991). Indeed, the Supreme Court has described stare decisis as "a basic self-governing principle within the Judicial Branch, which is entrusted with the sensitive and difficult task of fashioning and preserving a jurisprudential system that is not based upon 'an arbitrary discretion.'" Patterson v. McLean Credit Union, 491 U.S. 164, 172 (1989) (quoting The Federalist No. 78), superseded on other grounds, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071. If courts of appeals rendering legal decisions do not feel obligated to treat materially identical cases alike, the law will largely depend upon who happens to be making the decision, and our adherence to the rule of law will be diminished. Cf. James B. Beam Distilling Co. v. Georgia, 501 U.S. 529, 537 (1991) (opinion of Souter, J.) (the principle "that litigants in similar situations

should be treated the same" is "a fundamental component of stare decisis and the rule of law generally").

We are thus drawn to an inescapable conclusion: although Angulo-Hernández has no res judicata effect here, "we nonetheless are bound to follow it, under principles of stare decisis, insofar as the record now before us does no more than replicate the same facts that were before us" in the previous appeal. Perez v. Volvo Car Corp., 247 F.3d 303, 313 (1st Cir. 2001). As we have already said, Cardales-Luna has not pointed to any fact or circumstance that favorably distinguishes his case from that of Casiano-Jiménez and Brito-Fernández. The exact same evidence that we held to be sufficient to prove knowledge in Angulo-Hernández was offered against Cardales-Luna in his separate trial, and nothing in the record of this case suggests that the four circumstantial considerations we considered dispositive in Angulo-Hernández apply with any less force here. We therefore follow Angulo-Hernández in concluding that the evidence against Cardales-Luna was sufficient to sustain his conviction.

## II.

Cardales-Luna raises a second issue that we did not squarely decide in Angulo-Hernández, apparently because the other defendants did not raise it on appeal. The MDLEA prohibits drug trafficking aboard "a vessel subject to the jurisdiction of the United States," 46 U.S.C. § 70503(a)(1), which includes "a vessel

-11-

registered in a foreign nation if that nation has consented or waived objection to the enforcement of United States law by the United States," id. § 70502(c)(1)(C). To prove that the Osiris II was subject to the jurisdiction of the United States, the government presented the certification of G. Philip Welzant, U.S. Coast Guard Liaison Officer to the Bureau of International Narcotics and Law Enforcement Affairs, U.S. Department of State, who declared: "On February 5th, 2007, Bolivian authorities notified the United States that the Government of Bolivia waived objection to the enforcement of U.S. laws by the United States with respect to the vessel Osiris II, including its cargo and all persons onboard."

Cardales-Luna contends that Commander Welzant's certification is deficient because it does not state the name of the Bolivian official involved or the exact time and means of the communication between the two governments. In support of his position, he cites United States v. Leuro-Rosas, a decision in which we quoted from the legislative history of the MDLEA:

> In instances where the United States is required to prove a foreign nation's consent or waiver of objection to U.S. enforcement, or such a nation's denial of claim of registry, this section permits proof by certification of the Secretary of State or the Secretary's designee. Such a certification should spell out the circumstances in which the consent, waiver, or denial was obtained, including the name and title of the foreign official acting on behalf of his government, the precise time

-12-

> of the communication, and the means by which the communication was conveyed.

952 F.2d 616, 620 (1st Cir. 1991) (quoting S. Rep. No. 99-530, at 14 (1986), reprinted in 1986 U.S.C.C.A.N. 5986, 6000-01). We implied in Leuro-Rosas that a certification that did not substantially comply with the "requirements articulated by Congress" might be rejected as insufficient to prove the foreign nation's consent. See id. at 620-21.

Any argument under Leuro-Rosas is unavailing to Cardales-Luna because the MDLEA has been materially amended since we decided that case. When we heard Leuro-Rosas, the statute provided that the foreign nation's consent "may be proved" by certification of the Secretary of State or her designee. Id. at 619 (quoting former 46 U.S.C. app. § 1903(c)(1)). That left open the possibility that a defendant could "look behind the State Department's certification to challenge its representations and factual underpinnings." United States v. Guerrero, 114 F.3d 332, 341 (1st Cir. 1997) (reserving the issue).

Congress effectively foreclosed that possibility in 1996, when it amended the MDLEA to provide that "[c]onsent or waiver of objection by a foreign nation to the enforcement of United States law by the United States . . . is proved conclusively by certification of the Secretary of State or the Secretary's

designee."[5]  46 U.S.C. § 70502(c)(2) (emphasis added).  Under the current statute, the Secretary of State (or her designee) need only certify that the "foreign nation" where the vessel is registered "has consented or waived objection to the enforcement of United States law by the United States."  Id. § 70502(c)(1)(C).  Such a certification is "conclusive[]," and any further question about its legitimacy is "a question of international law that can be raised only by the foreign nation."  United States v. Bustos-Useche, 273 F.3d 622, 627 & n.5 (5th Cir. 2001).  Commander Welzant's terse certification, though not in the preferred form, was therefore sufficient to establish that the Osiris II was "subject to the jurisdiction of the United States."

### III.

Finally, we must address one other matter.  We acknowledge the forceful dissent by Judge Torruella concluding that Congress exceeded its authority under Article I of the Constitution by enacting 46 U.S.C. §§ 70502(c)(1)(C) and 70503(a)(1) and thereby authorizing the enforcement of United States criminal law against people and activities lacking any nexus with this country.  Judge Torruella asserts that this constitutional challenge implicates the subject matter jurisdiction of the court and must be addressed by

_____

[5]      There are minor differences in wording between the 1996 amendment and the version in force today, but they have no substantive significance.  See United States v. Betancourth, 554 F.3d 1329, 1334 & n.4 (11th Cir. 2009).

-14-

us even though the constitutional challenge was never raised below or on appeal.  We respectfully disagree with the assertion that this constitutional challenge posed by Judge Torruella involves the subject matter jurisdiction of the court.  Instead, we agree with the position of the D.C. Circuit in United States v. Baucum, 80 F.3d 539, 541 (D.C. Cir. 1996): "If a challenge to the constitutionality of an underlying criminal statute always implicated subject-matter jurisdiction, then federal courts, having an obligation to address jurisdictional questions sua sponte, would have to assure themselves of a statute's validity as a threshold matter in any case.  This requirement would run afoul of established Supreme Court precedent declining to address constitutional questions not put in issue by the parties."

**Affirmed**.


**- Dissenting Opinion Follows -**

-15-

**TORRUELLA**, <u>Circuit Judge</u> **(Dissenting).** For the reasons laid out below, I respectfully dissent.

### A. <u>Stare decisis</u>, the insufficiency of the evidence and the failure of the government to meet its constitutional burden

The application of the doctrine of <u>stare decisis</u> to Appellant, under the circumstances of this case, effectively results in the denial, or at least the unconstitutional diminution, of his right to a full and independent assessment of <u>his</u> particularized guilt or innocence. Such a consideration is mandated by the due process clause of the Fifth Amendment. This failing is readily reflected in the majority's tractable conclusion that there is sufficient evidence on the record from which a jury can conclude that Appellant is guilty beyond a reasonable doubt of the crimes for which he is charged. This outcome against Appellant is principally based on the fact that this same evidence was presented in the earlier case, <u>United States</u> v. <u>Angulo-Hernández</u>, 565 F.3d 2 (1st Cir. 2009), <u>see Maj. Op.</u> at 4, in which three of the crew members were found guilty, while four were acquitted. But two of the guilty crew members were in substantially different factual and legal postures than the Appellant in this case, for they were the captain and engineer of the <u>Osiris II</u>. <u>Id.</u> at n.4. This crucial difference to Appellant's case is called by the majority a "somewhat stronger" case against those other defendants.

-16-

<u>Id.</u> at n.2.  No explanation is given for third crew member found guilty on the same evidence on which the other four were acquitted.

At the government's urging, the deficiencies in the government's present case (e.g., Appellant not being an officer of the <u>Osiris II</u>), are made up by resorting to speculation ("[the] Coast Guard officer testified that the other crew members appeared to treat [Appellant] . . . with deference."  <u>Id.</u> at 4), and by the piling of inference upon inference (e.g., Appellant was given a wood chair to sit on; Appellant was fed first; and such similar banalities).  The smoking gun that is relied upon in both the first case and in this one is the discovery of "new-looking" screws securing the secret compartment in which the contraband was found near the vessel's aft lube oil tank.  The top to this compartment, which the "shining screws" were securing, was under a layer of rubber matting and two layers of plywood.  It took the Coast Guard six days of intensive search to find and uncover this compartment.  There is not an iota of evidence connecting Appellant to this compartment or to its contents except outright speculation.  <u>Cf.</u>, <u>United States</u> v. <u>Pérez-Meléndez</u>, 599 F.3d 31 (1st Cir. 2010).  Why do the "shining screws" doom Appellant <u>in particular</u> any more (or less) than all the other crew members found not guilty?  Can his sitting on a wooden chair, and his eating first, make for the quantum leap that is being asked of this court to establish <u>his knowledge</u> beyond a reasonable doubt?  I think not.  Based on this

record, *if the evidence against Appellant is independently considered apart from the outcome of the case of the defendants found guilty in the prior case*, I fail to see how it can possibly be concluded that the government has established the element of "knowledge" that is essential to the establishment of the charges against Appellant.

The outcome that results from this case is one more step on the slippery slope down which we have been sliding for some time. See United States v. Azubike, 564 F.3d 59 (1st Cir. 2009). This conclusion unquestionably constitutes a further lowering of the bar which the government must constitutionally meet to prove guilt beyond a reasonable doubt. Id. at 71.

**B. The unconstitutional application of U.S. criminal law to persons and activity without any nexus to, or impact in, the United States**

The matters previously discussed are almost irrelevant to the outcome of this appeal when compared to the more basic jurisdictional issue that arises from the government's reliance on the Maritime Drug Enforcement Act (MDLEA), codified as amended at 46 U.S.C. §§ 70501-70507, as the basis for the extraterritorial application of the criminal laws of the United States to Appellant.

The invalidity of the application of MDLEA to Appellant results from Congress's ultra vires extension of its Article I

legislative powers[6] to foreign territory,[7] as applied to persons and/or activities that have no nexus with the United States. See, Eugene Kontorovich, Beyond the Article I Horizon: Congress's Enumerated Powers and Universal Jurisdiction over Drug Crimes, 93 Minn. L. Rev. 1191 (2009); cf. José A. Cabranes, Our Imperial Criminal Procedure: Problems in Extraterritorial Application of U.S. Constitutional Law, 118 Yale L. J. 1660, 1671-1680 (2009). By the enactment of 46 U.S.C. §§ 70503(a)(1) and 70502(c)(1)(C) of the MDLEA, allowing the enforcement of the criminal laws of the United States against persons and/or activities in non-U.S. territory in which there is a lack of any nexus or impact in, or on, the United States, Congress has exceeded its powers under Article I of the Constitution. Any prosecution based on such legislation constitutes an invalid exercise of jurisdiction by the United States, and is void ab initio. See United States v. Walker, 59 F.3d 1196, 1198 (11th Cir. 1995). Cf. United States v. Lopez, 514 U.S. 549 (1995) (holding that Congress exceeded its commerce clause authority when it enacted the Gun-Free School Zone Act and concluding that the conviction must be vacated.). This is a

---

[6]Article I, § 8, cl. 10 grants Congress power "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations."

[7]A vessel is considered territory of the nation whose flag it flies. United Nations Convention on the Law of the Sea art. 91, Dec. 10, 1982, 1833 U.N.T.S. 397 [hereinafter UNCLOS]. Available at http://www.un.org/Depts/los/index.htm.

fundamental structural problem that goes to Congress's power to legislate under Article I of the Constitution which cannot be waived by any individual or foreign nation.

The facts relevant to this question are crystal clear and undisputed: Appellant, a Colombian national, was apprehended in international waters near the northern coast of South America, aboard a Bolivian-registered vessel, the Osiris II, which was crewed by an all non-United States citizen compliment. The Osiris II was en route from Colombia to the Dominican Republic with a cargo of toilet paper and diverse other items. Initially, the Coast Guard boarded the vessel allegedly[8] to help the crew repair the broken-down engine of the Osiris II. However, while rummaging aboard the vessel inspecting for safety matters, the boarding party found some powder residue which originally field-tested positive for heroin. Although this eventually turned out not to be the case, this "discovery" provided the excuse for the arrest of the Osiris II and its crew after the Bolivian Government "waived objection to the enforcement of U.S. laws by the United States with respect to the Osiris II, including its cargo, and all persons onboard." Thereafter, the Osiris II was towed by the Coast Guard to San Juan, Puerto Rico where for the next six days the vessel was thoroughly searched for contraband. As previously indicated,

---

[8]The Osiris II was on a Coast Guard watch list as a suspected smuggler of contraband.

contraband was eventually found in a secret stern compartment hidden below a rubber matting and two sheets of plywood. There is no evidence that any of the contraband found aboard the vessel was destined for U.S. territory, or that there was any connection with persons or activities in U.S. territory, or with persons who were U.S. nationals. The only injection of the United States into this case comes about from the fact that the vessel that intercepted the Osiris II was a U.S. Coast Guard vessel, and the further fact, that upon the erroneous discovery of what was believed to be contraband by the Coast Guard, the United States sought and received from the Government of Bolivia a waiver to the enforcement of U.S. laws in Bolivian territory.

Appellant was charged, tried, convicted and sentenced pursuant to the MDLEA, which prohibits drug trafficking aboard "a vessel subject to the jurisdiction of the United States," 46 U.S.C. § 70503(a)(1), which definition includes "a vessel registered in a foreign nation if that nation has consented or waived objection to the enforcement of United States law by the United States." 46 U.S.C. § 70502(c)(1)(C). The question is thus squarely presented whether Congress has the power to extend the criminal jurisdiction of the United States extraterritorially irrespective of the lack of a nexus of the activity or persons to the United States, merely because there is consent to the exercise of such jurisdiction by the nation whose citizens or territory are the subject of said

-21-

application of U.S. law. This issue is, of course, jurisdictional in nature and thus can be raised at any stage of a case, United States v. Madera-López, 190 F. App'x 832, 834 (11th Cir. 2006), including by the court motu proprio, as I am presently doing.

In my opinion, Congress does not have the power to extend the criminal jurisdiction of the United States for the crimes charged on the facts of the case before us.[9]

Although under the international law doctrine of universal jurisdiction (UJ), a nation may prosecute certain serious offenses even though they have no nexus to its territory or its nationals, and no impact on its territory or its citizens, see Restatement (Third) of Foreign Relations Law of the United States, § 404 cmt. a (1987), the crimes charged in this case are not within the categories for which the application of UJ is permitted. In enacting the MDLEA, Congress has purportedly attempted to come within the umbrella of UJ doctrine by looking to Article I, § 8, cl. 10 of the Constitution as the source of its authority. This provision, however, does not authorize the regulation of purely

---

[9]An additional issue presented by the MDLEA and the facts in this case is the validity of the retroactive application of U.S. criminal law to Appellant, that is, the application of U.S. law to Appellant for actions that were not violations of that law until after the consent was given by the Bolivian government to subject Appellant to said law. This in turn presents an issue of the extent to which the Constitution is applicable in international waters. Cf. Boumediene v. Bush, 553 U.S. 723 (2008). Because these matters were not raised below, and are not jurisdictional in nature, I will not attempt to decipher their complexity at this time.

foreign conduct except as regards to piracy on the high seas, and two other situations to be presently discussed. See Eugene Kontorovich, The "Define and Punish" Clause and the Limits of Universal Jurisdiction, 103 Nw. U. L. Rev. 149 (2009) (examining the scope of these powers). In this respect it should be noted that Article I, § 8, cl. 10 -- which gives Congress the power to "define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations" -- enumerates three distinct, although related, groupings but only authorizes UJ over crimes that are universally cognizable under international law. The term "universally cognizable," as will be presently explained, is not equivalent to "generally" cognizable but refers to those crimes conferring universal jurisdiction as that term is used in international law. Other than in the case of those limited crimes, there is no general authority to regulate purely foreign criminal conduct that does not have a demonstrable connection with the United States.

As a learned scholar on this subject sardonically comments, "Congress cannot punish dog-fighting by Indonesians in Java because Congress has not been authorized by the Constitution to make such laws." Kontorovich, Beyond the Article I Horizon, supra, at 1194 (emphasis in original). Perhaps an even more relevant example would be if Congress passed legislation attempting to apply the criminal laws of the United States, with the Bolivian

government's consent, to the conduct of Colombian nationals in Bolivia traveling over its mountain roads carrying a load of coca leaves destined for Peru. The power of Congress to legislate in such a case cannot be countenanced even with the consent of Bolivia, whose consent is ultimately irrelevant, for Bolivia cannot grant Congress powers beyond those allotted to it by the Constitution.

Until recently, piracy was the only crime which was punishable by all nations, and which could be prosecuted by whatever nation acquired personal jurisdiction over the alleged pirate. Thus it was the only crime to which the doctrine of UJ could be applied. Kontorovich, Beyond the Article I Horizon, supra, at 1194; see also United States v. Yousef, 327 F.3d 56, 104 (2d Cir. 2003) ("The class of crimes subject to universal jurisdiction traditionally included only piracy."). This point is of more than passing academic relevance, for the constitutional power of Congress to legislate is thus considerably different depending on whether it is dealing with "Piracy," "Felonies committed on the high Seas," or "Offences against the Law of Nations" (piracy also falls within this category). See United States v. Shi, 525 F.3d 709, 721 (9th Cir. 2008) (citing United States v. Smith, 18 U.S. (5 Wheat.) 153, 158-59 (1820), and noting that Smith treats these three crimes "as three separate offenses.").

During the legislative process leading to the enactment of the MDLEA's predecessor, the Marijuana on the High Seas Act of 1980 (MHSA), Pub. L. No. 96-350, 94 Stat. 1159 (1980), an attempt was made to enact a provision that would have allowed the application of U.S. drug laws to foreign vessels, irrespective of a U.S. nexus, provided that the U.S. received prior approval of its exercise of extraterritorial jurisdiction from the flag nation of the vessel in question. See Kontorovich, Beyond the Article I Horizon, supra, at 1198 (citing H.R. Rep. No. 96-323 (1979), at 7). This proposal, however, was rejected by the Committee on Merchant Marine and Fisheries of the House based on "'[v]arious jurisdictional and constitutional' objections to using a state's 'prior consent as a basis for . . . domestic criminal jurisdiction.'" Id. (quoting H.R. Rep. No. 96-323, at 7). Additionally, the proponents of that provision expressed the view that "as a matter of international law, flag state consent would still be an inadequate basis [for jurisdiction to attach] given that drug trafficking is not generally accepted as an international crime." Id. (citing H.R. Rep. No. 96-323, at 20).

These concerns were swept aside in the intervening years until the MDLEA was enacted because of the abysmal failure of the so-called War on Drugs to stem the inflow of illegal drugs into the

United States,[10] and the perceived difficulties of "international jurisdictional questions as legal technicalities to escape conviction." S. Rep. No. 95-797, at 15 (1986), reprinted in 1986 U.S.C.C.A.N. 5986, 5993.  The MDLEA was thus enacted, expanding U.S. drug laws to any foreign vessel on the high seas, or even in foreign territorial waters, so long as the relevant foreign nation consented.  See 46 U.S.C. § 70502(c)(1)(C).  The MDLEA allows this consent to be given in any form, including "by radio, telephone, or similar oral or electronic means," id. § 70502(c)(2)(A), and provides that it "is proved conclusively by certification of the Secretary of State or the Secretary's designee," id. § 70502(c)(2)(B).  Furthermore, the MDLEA brushes aside any presumption against extraterritoriality, id. § 70503(b), barring any challenge based on jurisdictional or substantive defenses that the United States has failed to comply with international law. Id. § 70505.  "[A] 1996 amendment sought to keep all questions of statelessness away from the jury by providing that '[j]urisdiction of the United States with respect to vessels of the United States subject to [the drug laws] is not an element of any crime . . . [and instead] are preliminary questions of law to be determined solely by the trial judge." Kontorovich, Beyond the Article I Horizon, supra, at 1201

---

[10]A congressional report noted that the Coast Guard was "able to seize 'at best, 8 to 10 percent' of the drugs" smuggled by sea into the United States. See Kontorovich, Beyond the Article I Horizon, supra, at 1197 (quoting H.R. Rep. No. 96-323, at 4).

(quoting Coast Guard Authorization Act of 1996, Pub. L. No. 104-324, § 1138 (a) (5), 110 Stat. 3901 (currently at 46 U.S.C. §§ 70501-70707)).

Although under "international law, the Coast Guard cannot stop or board foreign vessels on the high seas or in foreign waters," id. at 1201 (citing United Nations Convention on the Law of the Sea, Nov. 16, 1994, 1833 U.N.T.S. 438, signed by 161 nations (not including the United States) [hereinafter "UNCLOS"] art. 110), since the enactment of the MDLEA the United States has negotiated twenty-six bilateral agreements with Caribbean and Latin American countries which implement this statute in various degrees and forms allowing the enforcement of American criminal laws aboard foreign vessels, with the prior approval of the national government in question. Id. (citing U.S. Dep't. of State, Bureau of Int'l Narcotics and Law Enforcement Affairs, Narcotics Control Strategy Report, March 2007, available at http://www.state.gov/p/inl/rls/nrcpt/2007/vol1/html/80853.htm).[11] The bottom line is that the MDLEA is the only statute under which the United States asserts universal criminal jurisdiction.

---

[11]Obviously Congress has the power to override international law by either passing legislation to said effect, or entering into treaties that modify or reject international law. See United States v. Martínez-Hidalgo, 993 F.2d 1052, 1056 (3d Cir. 1993) ("Congress may override international law by clearly expressing its intent to do so.").

As indicated, the question of Congress exceeding its Article I power under the facts of this case is structural in nature and cannot be waived by either the individual concerned or the nation of which he is a citizen or on whose vessel he is apprehended. As regards Article I, this is a question of first impression which has not been dealt with by either the Supreme Court or this court.[12] Although these questions have been summarily

---

[12]The Ninth and Eleventh Circuits have considered, and rejected, challenges to the MDLEA based on Article I. United States v. Perlaza, 439 F.3d 1149, 1158-60 (9th Cir. 2006); United States v. Humphries-Brant, 190 F. App'x. 837 (11th Cir. 2006); United States v. Madera-López, 190 F. App'x. 832 (11th Cir. 2006); and United States v. Moreno-Morillo, 334 F.3d 819, 824 (9th Cir. 2003).

However, it is important to note, that the Ninth Circuit's constitutional holdings in Perlaza and Moreno-Morillo were dictated by binding circuit precedent -- in particular, two prior Ninth Circuit cases, United States v. Davis, 905 F.2d 245 (9th Cir. 1990), and United States v. Aikins, 946 F.2d 608 (9th Cir. 1990). We are not similarly bound.

Moreover, as with the Eleventh Circuit Madera-López and Humphries-Brant cases (decided the same day), Davis and Aikins addressed the Article I challenge in the most cursory fashion, without the benefit of any developed analysis. Davis merely cited the define and punish clause as a constitutional basis for the MDLEA, 905 F.2d at 248, and Aikins added only that the MDLEA was "intended by Congress to apply to conduct on the high seas," but did not consider the question of what construction of the define and punish clause would allow it to do so. 946 F.2d at 613.

Finally, and perhaps most tellingly, the Ninth Circuit has consistently held -- even in Davis itself -- that the MDLEA cannot apply extraterritorially unless there is proof of some kind of nexus to the United States. Davis, 905 F.2d at 248-49 ("In order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair.")

-28-

considered under the Fifth Amendment's due process clause, those resolutions rest on different criteria because those challenges have been based on Fifth Amendment claims of individual rights (i.e., due process), which can thus be waived by individuals (and probably the nation of which they are citizens), while the challenge under Article I concerns the structural power of Congress under the Constitution. The issue of whether Congress has the authority to enact the MDLEA cannot be waived, and Congress' power cannot be augmented by the consent of a foreign entity or even by treaty, but only by amending the Constitution.

At the time of the Framing (and until recently), piracy was the only UJ offense. See United States v. Robins, 27 F. Cas. 825, 862 (D.S.C. 1799) (No. 16,175) ("Piracy under the law of nations . . . alone is punishable by all nations . . . .") (emphasis added). Referred to as hostis humani generis (enemy of all mankind), it was subject to prosecution by any nation, irrespective of territorial jurisdiction or national nexus. "The definition of UJ piracy [under] international law [is] narrow,

---

(citation omitted); Perlaza, 439 F.3d at 1160 (finding that district court's claim of jurisdiction over defendants, when government had not produced any evidence of nexus, was reversible error).

In short, although the Ninth Circuit has rejected the Article I challenge considered here, it did so on the basis of its own case law, did not give sustained analysis to the merits of the claim, and came to very nearly the same conclusion that the Article I challenge suggests, albeit under the rubric of due process rather than Article I.

specific, and undisputed: it is robbery on the high seas." Kontorovich, Beyond the Article I Horizon, supra, at 1209 (citing Smith, 18 U.S. (5 Wheat.) at 158). However, in addition to UJ piracy, each nation can make diverse offenses "municipal" or "statutory" piracies, which can be punished within the particular state's municipal jurisdiction. But such crimes can only be punished by that state within its territorial jurisdiction, or when committed against its vessels, which includes its own vessels while on the high seas. The distinction of the power of Congress between cases involving "Piracy" (the UJ variety), and "Felonies committed on the high seas" (the "municipal" piracies variety and other statutory crimes), was recognized from the beginning of our constitutional history. Justice James Wilson, a member of the first Supreme Court and a member of the Constitutional Convention, argued that if it was Congress's intention to apply a murder provision in a statute then being considered, to foreigners on a foreign vessel, it would be an unconstitutional exercise of power by Congress. Kontorovich, Beyond the Article I Horizon, supra, at 1211 (citing 2 The Works of James Wilson 803, 813 (Robert Green McCloskey ed., 1967)). This view was confirmed by Chief Justice John Marshall while he was a member of Congress, who rhetorically asked in a speech challenging the validity of this proposal, "could the United States punish desertion by British seamen from a British vessel to a French one, or pick-pocketing among British sailors

-30-

[aboard a British ship]? If the text [of the Constitution] does not expressly forbid [universal jurisdiction in such circumstances] it is only because it was too silly for the Framers to have contemplated it." Id. at 1211-12 (citing 4 The Papers of the John Marshall, Charles T. Cullen & Leslie Tobias eds., 1984, at 102).

These views were judicially confirmed in two Supreme Court cases that considered these issues early in the 19th Century. In United States v. Palmer, 16 U.S. (3 Wheat.) 610 (1818), in which a Spanish vessel was robbed by a foreign defendant on the high seas, a classic case of UJ piracy, the Court held that while Congress could constitutionally extend UJ to genuine piracies, the 1790 act in question had not done so. Kontorovich, Beyond the Article I Horizon, supra, at 1212-13 (citing Palmer, 16 U.S. (3 Wheat.) at 633-34.) It should be noted that in that case, the U.S. Attorney arguing for a broad scope of the law conceded that the statute in question could not be constitutionally applied universally to non-piratical offenses. Palmer, 16 U.S. (3 Wheat.) at 618. In dissent, Justice Johnson wrote, "[C]ongress cannot make [something]... piracy which is not piracy by the law of nations, in order to give jurisdiction to its own courts over such offenses." Id. at 641-42 (Johnson, J. dissenting).

Just two years later, a unanimous Court reaffirmed that principle when it held that Congress could not punish the murder of a foreigner by a foreigner on a foreign vessel in international

waters. Kontorovich, Beyond the Article I Horizon, supra, at 1214. The holding in United States v. Furlong, 18 U.S. (5 Wheat.) 184, 196 (1820), again made a distinction between UJ piracy and other crimes, stating that the later were "beyond the punishing power of the body that enacted" the law, i.e., Congress. Thus, Furlong makes clear that Congress lacks the power to define the "constituents" of an offense without regard to the definition of that crime under international law, and furthermore, that it cannot apply the "incidents" of piracy to something that does not have that status under international law, i.e., Congress cannot expand its UJ jurisdiction by calling crimes "piracies" when they do not have that status under international law. Kontorovich, Beyond the Article I Horizon, supra, at 1215. Piracy and murder, the Court held in Furlong, "are things so essentially different in nature, that not even the omnipotence of legislative power can confound or identify them." 18 U.S. (5 Wheat.) at 198.

The first major incursion by Congress at expansion of UJ occurred in the early 19th Century as a result of the changing international views on slavery, and the international efforts to eradicate the transcontinental slave trade. The first federal statute in this area, enacted in 1820, declared the slave trade a form of piracy punishable by death, but stopped short of extending UJ to cover this crime, punishing only this conduct where there was a demonstrable U.S. nexus. Kontorovich, Beyond the Article I

Horizon, supra, at 1216 (citing "An Act to protect the commerce of the United States," ch. 113, §§ 4-5, 3 Stat. 600, 600-01 (1820)). The report of the House Committee on the Slave trade explained that "the Constitutional power of the Government had already been exercised . . . in defining the crime of piracy," but as to the slave trade, it had yet to become a crime that was universally cognizable. "The definition and punishment [of the slave trade] can bind only the United States." Id. (citing 36 Annals of Cong. 2210 (1820)).

We thus come to the central question affecting the UJ that MDLEA attempts to create: are the drug offenses established under MDLEA, "Piracy" or are they "Felon[ies]" within the meaning of Article I, § 8, cl. 10?  As we have seen, the definition of UJ piracy is "robbery when committed upon the sea." Smith, 18 U.S. (5 Wheat.) at 162. The MDLEA drug offenses are clearly outside this definition of "piracy."  Equally pellucid is the proposition that Furlong prohibits Congress from attaching the jurisdictional consequences of UJ to run of the mill "felonies." Furlong, 18 U.S. (5 Wheat.) at 196-97 (stating that universal criminal jurisdiction over piracy does not extend to murder.).  As stated by the Court in Furlong "[i]f by calling murder piracy, [the United States] might assert jurisdiction over that offense committed by a foreigner in a foreign vessel, what offense might not be brought within [its] power by the same device?" Id. at 198. The short answer is no

offense, for certainly if murder, which often follows acts of piracy on the high seas, cannot be independently brought within UJ, drug trafficking, which is a distinctly different and separate type of offense than UJ piracy, cannot be so treated by Congress, among other reasons because drug trafficking is not a universally cognizable offense in international law, the point of reference on this issue under the Constitution. See U.S. Const. art. I, § 8, cl. 10 (referring to "Offences against the Law of Nations.").

The "Law of Nations" is generally understood to be the eighteenth and nineteenth-century term for "customary international law." Kontorovich, Beyond the Article I Horizon, supra, at 1224 n.225 (citing Flores v. S. Peru Copper Corp., 414 F.3d 233, 237 n.2 (2d Cir. 2003) ("[W]e have consistently used the term 'customary international law 'as a synonym for the term the "law of nations.'")). The major sources of international law in the United States pursuant to the Supremacy Clause, U.S. Const. art. VI, § 2, are treaties and customary international law (which is somewhat the common law of international law, but is nevertheless part of our municipal law under the Supremacy Clause.

Drug trafficking is not recognized in customary international law as a universally cognizable offense, and all U.S. courts to have considered this issue have so ruled. Kontorovich, Beyond the Article I Horizon, supra, at 1224 n.229 (citing United States v. Perlaza, 439 F.3d 1149, 1162-63 (9th Cir. 2006)

-34-

(rejecting UJ as a jurisdictional basis for the MDLEA) and 1224 n.226 (citing Antonio Cassese, International Law, 426 (2d ed. 2005) (noting that illicit drug traffic in narcotics is not a crime under customary international law); United States v. Wright-Baker, 784 F.2d 161, 168 n.5 (3d Cir. 1986) ("[I]nternational agreements have yet to recognize drug smuggling as a threat to a nation's 'security as a state or the operation of its governmental functions' warranting protective jurisdiction or as a heinous crime subject to universal jurisdiction.") (superseded by statute, 46 U.S.C. § 70505 (2007)). Although the exact contours of what crimes come within UJ are not established with precision, there is a general consensus that to qualify for UJ the crime involve egregious, violent human rights abuses. See Kontorovich, Beyond the Article I Horizon, supra, at 1224 n.228 (citing Restatement (Third) of Foreign Relations Law § 404 (1987) (providing a list of UJ offenses); Universal Jurisdiction: National Courts and the Prosecution of Serious Crimes Under International Law, 178-79 (Stephen Macedo ed. 2004) (stating that for a crime to qualify as a UJ offense it must be "contrary to a peremptory norm of international law" and "be so serious and on such a scale that [it] can justly be regarded as an attack on the international legal order.")). Clearly drug trafficking, although unquestionably a serious crime, is hardly an "attack on the international legal order." Other than the United States under the MDLEA, there is no other state practice

-35-

establishing UJ over drug trafficking. Kontorovich, Beyond the Article I Horizon, supra, at 1225.

The UNCLOS is regarded as expressing customary international law on the subject. Id. (citing Statement on United States Ocean Policy, 1 Pub. Papers 378 (March 10, 1983) ("[T]he convention . . . contains provisions with respect to traditional uses of the oceans which generally confirm existing maritime law and practice . . ."")). Only piracy and the slave trade are defined as within UJ jurisdiction, and in those cases, by explicit provision in Articles 99 and 105 of the Convention. Id. at 1226.[13] As to drug trafficking, Article 108 makes it clear that this activity is not considered an international law crime.[14] To be

---

[13]Article 99 of the UNCLOS provides, "[e]very State shall take effective measures to prevent and punish the transport of slaves in ships authorized to fly its flag and to prevent the unlawful use of its flag for that purpose. Any slave taking refuge on board any ship, whatever its flag, shall ipso facto be free."

Article 105 provides, "[o]n the high seas, or in any other place outside the jurisdiction of any State, every State may seize a pirate ship or aircraft, or a ship or aircraft taken by piracy and under the control of pirates, and arrest the persons and seize the property on board. The courts of the State which carried out the seizure may decide upon the penalties to be imposed, and may also determine the action to be taken with regard to the ships, aircraft or property, subject to the rights of third parties acting in good faith."

Piracy is defined in Article 101.

[14]Article 108 is as follows:

1. All States shall cooperate in the suppression of illicit traffic in narcotic drugs and psychotropic substances engaged in by ships on the high seas contrary

classified as such, the crime must be "so inhumane, so shocking to the conscience, that it makes all jurisdictional" considerations irrelevant. Id. In fact, U.S. courts have ruled that not even "terrorism has attained the status of a UJ offense, and thus cannot be placed on the same jurisdictional footing as piracy." Id. (citing Yousef, 327 F.3d at 107-08).

There are crucial differences between conduct that all nations criminalize, and what is considered an international crime, particularly one subject to UJ. Id. (citing M. Cherif Bassiouni, Universal Jurisdiction for International Crimes: Historical Perspectives and Contemporary Practice, 42 Va. J. Int'l. L. 81, 152 (2001) (distinguishing "universality of condemnation" from "universal reach of national jurisdiction.")). Indeed international views about murder are almost unanimous in their condemnation of such conduct, as compared to drug laws and attitudes, as to which there are considerable variations. Id. at 1226-27. See also Susana Ferreira, At 10, Portugal's Drug Law Draws New Scrutiny, Wall St. J., July 20, 2010, at A13; Associated Press, Mexico Legalizes Drug Possession, N. Y. Times, Aug. 21, 2 0 0 9 , a v a i l a b l e a t

---

to international conventions.

2. Any State which has reasonable grounds for believing that a ship flying its flag is engaged in illicit traffic in narcotic drugs or psychotropic substances may request the cooperation of other States to suppress such traffic.

http://www.nytimes.com/2009/08/21/world/americas/21mexico.html;
Christian Moraff, Latin America's Legalization Push, A. M.
Prospect, July 6, 2009, available at http:/www.prospect.org/cs/
articles?article=latin _americas_legalization_push).  Yet as we
know from Furlong, murder is not a UJ offense. 18 U.S. (5 Wheat.)
at 196-97.

These principles regarding UJ jurisdiction have been
relaxed to include, in addition to piracy and the slave trade, the
case of stateless vessels and situations in which the protective
principle of jurisdiction is implicated. Kontorovich, Beyond the
Article I Horizon, supra, at 1227.  In the case of stateless
vessels we again go back to early constitutional history, not
totally unrelated to the UJ piracy.  In 1820, the Supreme Court in
essence decided that stateless vessels, that is, vessels that were
not registered or did not fly the flag of any nation, were
considered to have "turned pirate," i.e., were engaged in piracy
and the crew were pirates, and thus lost their status under
international law of having the protection of any nation and were
subject to the jurisdiction of whatever nation first acquired
physical jurisdiction over the vessel and its crew.  See id. at
1228 (citing United States v. Holmes, 18 U.S. (5 Wheat.) 412, 417-
18 (1820); United States v. Klintock, 18 U.S. (5 Wheat.) 144, 150
(1820)).  Although the MDLEA includes some jurisdictional
provisions that fall within these criteria of stateless vessels,

and which are consistent with today's customary international law, the MDLEA's definition of "statelessness" goes far beyond what is recognized by international customs or convention. See id. (citing 46 U.S.C. §§ 70502(c)(1)(A), 70502(c)(2)(A)-(B), 70502(c)(2)). This, however, is an issue for another day, as these provisions are not directly before us.

Under the principle of protective jurisdiction a state may "punish extraterritorially 'a limited number of offenses . . . directed against the security of the State or other offenses threatening the integrity of governmental functions.'" Id. at 1229 (citing Restatement (Third) of Foreign Relations Law § 402 cmt. f (1987)). However, "the conduct must be 'directed against the security of the [forum] state . . . .'" Id. at 1230 (citing Restatement (Third) of Foreign Relations Law § 403 (3)). Although "the legislative findings of the MDLEA conclude that trafficking 'presents a specific threat to the security and societal well-being of the United States,'" id. at 1229-30 (citing 46 U.S.C. § 70501), it is difficult to surmise how the conduct in this case was either directed at or constitutes a threat to, specific or otherwise, the security or societal well-being of the United States considering that the Osiris II was not headed to U.S. territory or even that the contraband aboard was destined for trans-shipment to the United States. Treating drug crimes as generally within the protective

jurisdiction theory would effectively eliminate the distinction with UJ, which would be unacceptable under Article I. Id. at 1231.

There are several other theories which could be argued as the basis for supporting the validity of the UJ created by MDLEA. The first is the power conceded to Congress by the Constitution over admiralty and maritime matters. See id. at 1234-37; U.S. Const. Art III, § 2. In United States v. Flores, 289 U.S. 137 (1933), the Court ruled that the Constitution granted to the federal government all powers within the admiralty jurisdiction. Kontorovich, Beyond the Article I Horizon, supra, at 1234 (citing Flores, 289 U.S. at 149-50). The Court thus concluded that within its admiralty powers, the United States had jurisdiction over a murder committed by a U.S. citizen aboard a U.S. flagged vessel, even though the vessel was in Belgian territorial waters, in fact several hundred miles up the Congo River. Flores, 289 U.S. at 153-54, 159. The defendant had contended that Article I, § 8, cl. 10 power could not reach conduct in foreign waters, id. at 146-47, an argument with which the Court agreed because the crime charged did not take place in the high seas and was thus was outside of the powers conceded to Congress under that provision. Id. However, the Court ruled that the matter was otherwise within the admiralty jurisdiction of the United States, because admiralty law follows the flag, irrespective of the fact that the ship in question was up a river in Africa. Id. at 159 ("[I]t is the duty of courts of the

-40-

United States to apply to offenses committed by its citizens on vessels flying its flag, its own statutes, interpreted in the light of recognized principles of international law."). But crucial to this conclusion is the fact that it involved a U.S. vessel, which is considered U.S. territory irrespective of where found. See Kontorovich, Beyond the Article I Horizon, supra, at 1234-35; UNCLOS, supra, art. 91. The Court stated, however, that the situation would have presented "a different question" had the case involved a foreign vessel. Flores, 289 U.S. at 157.

In point of fact Flores had been preceded almost one hundred years earlier by United States v. Wiltberger, which involved the killing of an American crew member aboard a U.S. vessel on a river thirty-five miles inside China. 18 U.S. (5 Wheat.) 77 (1820). That case was argued, however, on the international law principle that the law of the flag follows the vessel wherever it is located, rather than on the Court's admiralty jurisdiction. Kontorovich, Beyond the Article I Horizon, supra, at 1235-36 ("'There is no civilized nation, with which we are acquainted, where jurisdiction over offenses committed on board its own vessels, in foreign waters, would not be exercised[.]'") (citing United States v. Wiltberger, 28 F. Cas. 727, 728 (E.D. Pa. 1819) (No. 16, 738)). Chief Justice Marshall, in dictum, opined that foreign vessels would have stood on a different footing, and the U.S. Attorney who argued the case saw the constitutionality of

U.S. jurisdiction as depending entirely on the fact that the vessel was American. Id. at 126 (citing Wiltberger, 18 U.S. (5 Wheat.) at 82-84, 113-15).

Another possible source of Congressional power which it could be argued, sustains the validity of MDLEA is the Treaty Power. See U.S. Const. art II, § 2, cl. 2. Pursuant to Missouri v. Holland, 252 U.S. 416 (1920), it is claimed that Congress can act outside its enumerated powers under Article I when implementing a treaty. Kontorovich, Beyond the Article I Horizon, supra, at 1238 (citing Holland, 252 U.S. at 433). Thus, under current Supreme Court doctrine, legislation enacted pursuant to treaty obligations entered into by the United States, can allegedly trump structural constitutional constraints, but not express limitations of congressional power, such as individual rights guaranteed in the Bill of Rights. Id. at 1239 (citing Boos v. Barry, 485 U.S. 312, 324-29 (1988) and Reid v. Covert, 354 U.S. 1, 16-19 (1957)). Since the MDLEA does not raise any questions of federalism or separation of powers, and assuming it does not violate express individual rights (due process in particular[15]), under Missouri it could be argued that the MDLEA is a valid exercise of Congress's treaty

_____

[15]Most of the challenges to the MDLEA brought under the due process clause have been rejected. Kontorovich, Beyond the Article I Horizon, supra, at 1239 n.318; see, e.g., United States v. Cardales, 168 F.3d 548, 552-53 (1st Cir. 1999); United States v. Martínez-Hidalgo, 993 F.2d 1052, 1056 (3d Cir. 1993); United States v. Suerte, 291 F.3d 366, 372 (5th Cir. 2002); United States v. Rendon, 354 F.3d 1320, 1326-27 (11th Cir. 2003).

making authority, if "Necessary and Proper" to effectuate the obligations assumed by the United States which have become the law of the land. See U.S. Const. art I, § 8, cl. 18; Kontorovich, Beyond the Article I Horizon, supra, at 1239.

The question is, what treaty is being implemented? Kontorovich, Beyond the Article I Horizon, supra, at 1239. Nothing in the legislative history of MDLEA mentions a treaty or intimates that the legislation is in compliance with treaty obligations. Id. No court decision dealing with MDLEA refers to any treaty obligation as the source of Congress's Article I authority. Id. In fact, if anything, as previously stated, the UNCLOS does not authorize UJ over drug trafficking. See id. at 1239 & n.322.

Nor is the U.N.'s Convention Against Illicit Traffic in Narcotics and Psychotropic Substances, which has more than 150 state parties, the basis for UJ under the MDLEA, as its jurisdictional provisions first require the parties to take jurisdiction of offenses committed within their own respective territorial or flag jurisdiction. Id. at 1239-40 (citing United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psyotropic Substances art. 4 (1) (a), adopted Dec. 19, 1988, S. Treaty Doc. No. 101-4 (1989), 1582 U. N. T. S. 165 [hereinafter UNCAITNPS]). This Convention does encourage, but does not require, states to enter into bilateral agreements with each other,

authorizing interdiction of drug trafficking by each other's vessels. Id. at 1240 (citing UNCAPTNPS, supra, art. 17 (4) (c)).

The record does not reveal, and the Government has not pointed to the existence of a treaty between Bolivia and the United States establishing an MDLEA arrangement. We are unaware whether it is a treaty, or an executive agreement which does not receive Senate approval, and would be altogether on a different footing than a treaty under the Missouri v. Holland doctrine, or even an informal arrangement with Bolivia. See id. at 1240-41 (noting that mere executive agreements cannot be substitutes for treaties for purposes of Missouri v. Holland doctrine). I have searched all the usual sources and have failed to unearth any treaty or executive arrangement authorizing the exercise of U.S. jurisdiction over Bolivian territory (including vessels). But even if such a treaty exists, the UNCAITNPS only speaks of the possibility of these arrangements. It creates no rights or obligations, wherefore it cannot, in any event, be considered a source of legislative power under Missouri v. Holland doctrine, which speaks to the enactment of legislation which is required by treaty obligations of the United States. Id. at 1238-40. In fact, during the drafting of this Convention, a proposal by Canada specifically extending UJ to drug trafficking vessels, was specifically rejected. Id. at 1243 (citing Natalie Klein, The Right of Visit and the 2005 Protocol on

the Suppression of Unlawful Acts Against the Safety of Maritime
Navigation, 35 Denv. J. Int'l. L. & Pol'y 287, 304 (2007)).

This conclusion is reinforced when the UNCLOS and the
Convention Against Illicit Traffic of Drugs are compared: the first
specifically authorizes UJ over piracy and slave trading, while the
second, which explicitly points to the first in its Article 17 (1)
(referring to the "international law of the sea"), merely calls for
"cooperat[ion]." Id. at 1244; compare UNCLOS, supra, art. 108 (1)
with UNCAITNPS, supra, art. 17 (1). The UNCLOS establishes a
general rule of freedom of the Seas, a principle to which the
United States has adhered since the early days of the Republic, see
James Kraska and Brian Wilson, The Pirates of the Gulf of Aden: The
Coalition is the Strategy, 45 Stan. J. Int'l. L. 243, 258 (2009)
(noting that freedom of the seas is a core U.S. maritime interest
and that throughout history, the U.S. has worked to resist
disruptions to freedom of the seas), and does not make any
exception for drug trafficking, but rather reflects a deliberate
judgement to not allow UJ in only those cases. Kontorovich, Beyond
the Article I Horizon, supra, at 1244; see UNCLOS, supra, art. 108.

One last argument favoring the authority of Congress to
legislate the MDLEA is the Foreign Commerce Clause. See U.S. Const.
art I, § 8, cl. 3 (granting Congress power to "[t]o regulate
Commerce with foreign Nations."). Notwithstanding the breadth of
this power, it is unavailing in the present case, for it only

authorizes Congress to legislate conduct with a demonstrable and direct nexus to the United States, and in the present situation, no such nexus is extant. Kontorovich, Beyond the Article I Horizon, supra, at 1249 ("[Congress] is not empowered to regulate foreign commerce which has no connection with the United States.") (citing United States v. Yunis, 681 F. Supp. 896, 907 n.24 (D.D.C. 1988)).

The majority is of the view that it is inappropriate for me to raise, motu propio and on appeal for the first time, the lack of Article I power by Congress to enact legislation exercising criminal jurisdiction under the circumstances of this case. In support of its contention it cites United States v. Baucum, 80 F.3d 539, 541 (D.C. Cir. 1996), to the effect that "[i}f a challenge to the constitutionality of an underlying statute always implicated subject-matter jurisdiction, then federal courts, having an obligation to address jurisdictional questions sua sponte, would have to assure themselves of a statute's validity as a threshold matter in any case." Maj. Op. at 15. I respectfully disagree that this general proposition is applicable in the present circumstances.

The issues raised by Congress's ultra vires action in the present case do not involve just a run-of-the-mill constitutional challenge to the invalid exercise of an otherwise valid Article I power. What we have here is a question involving a structural lack of Article I power to legislate, whose very exercise is invalid.

This is a lack of power that has existed and been recognized as such since the beginnings of our Nation. See, supra, at 15-19. Furthermore, even the very Baucum court cited by the majority recognized that "there may well be appropriate circumstances when, in the exercise of its discretion, the appellate court may choose to hear constitutional claims not raised at trial." Baucum, 80 F.3d at 544. I can think of no better case in which to exercise such discretion than in a case involving this unprecedented action by Congress,[16] involving a situation of absolute lack of Article I power, and one which can have serious long-range implications against United States citizens in the context of other international scenarios.[17]

---

[16]There is no such other criminal or civil statute on the books. Congress has not attempted to exercise universal jurisdiction for any crime (except piracy, slavery and flagless vessels, all crimes recognized as coming within the universal jurisdiction exception), since its last attempt to do so in 1820, when its actions in this respect were declared unconstitutional. See Furlong, 18 U.S. (5 Wheat.) 184 (1820).

[17]The United States has resisted attempts to exercise extra-territorial jurisdiction over its citizens by other nations. See, Press Statement, Richard Boucher, U.S. Dep't of State, International Criminal Court: Letter to UN Secretary General Kofi Annan (May 6, 2002) at http//www.state.gov/r/paprs/2002/9968.htm. See also, Marise Simons, Spanish Court Weighs Inquiry on Torture for 6 Bush-Era Officials, N. Y. Times, Mar. 28, 2009, at A6, available at http://www.nytimes.com/2009/03/29/world/europe/29 spain.html?+baltazargarzon (describing complaint under Judge Baltazar Garzón's review asserting that Spain has jurisdiction over U.S. officials under, inter alia, the 1984 Convention Against Torture, which is binding on the United States); David Bosco, The Inquisition, Part II?, Washington Post, May 24, 2009, at BO2 (discussing Spain's judicial activism in the context of U.S. detention policies at Guantanamo Bay); cf. Rachel Donadio, Italy

Additionally, the majority's assertion that subject-matter jurisdiction is not implicated by this issue is far from a forgone conclusion. Allowing a conviction to stand under a statute which Congress was without power to enact is unacceptable, for "[i]n essence, the statute was void ab initio, and consequently, the district court below lacked subject matter jurisdiction with respect to that charge." United States v. Walker, 59 F.3d 1196, 1198 (11th Cir. 1995).

## C. Conclusion

This court lacks jurisdiction over Appellant because the law under which he was prosecuted, the MDLEA, is an unconstitutional exercise of the power beyond the authority granted to Congress under Article I of the Constitution. Except for piracy, slave trading, and stateless vessels, the United States lacks UJ to apprehend and try foreigners for conduct on foreign vessels on the high seas for violation of United States criminal laws where there is no nexus to the United States. I dissent.

---

Convicts 23 Americans for C.I.A. Renditions, N. Y. Times, Nov. 2009, at A15, available at http://www.nytimes.com/2009/11/05world/europe/05/italy.html.